IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

MICHAEL BRANDON

*Defendant*.

Criminal Action No.  ELH-22-0239

**MEMORANDUM OPINION**

Defendant Michael Brandon challenges the legality of a traffic stop and the ensuing search of him and his vehicle.  The search led to the recovery of a loaded firearm from Brandon and cocaine base and other contraband in the vehicle.

In a five-count Second Superseding Indictment, docketed on June 28, 2023 (ECF 49), Brandon has been charged with multiple offenses.[1]  In particular, Count One charges possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g).  Count Two charges possession of ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g). In Count Three, the defendant is charged with unlawful possession of a machine gun, in violation of 18 U.S.C. § 922(o).  Count Four charges the defendant with possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a).  And, Count Five charges the defendant with

---

[1] Defendant was initially indicted on July 6, 2022, on charges of possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g) (Count One), and unlawful possession of a machine gun, in violation of 18 U.S.C. § 922(o) (Count Two).  ECF 1. A Superseding Indictment was filed on February 1, 2023 (ECF 21), adding charges of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count Three) and possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count Four).

possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c).

The charges are rooted in the events of May 15, 2022, when Detective Kaivon Stewart, a police officer with the Baltimore City Police Department ("BPD"), conducted a daytime traffic stop of a vehicle operated by defendant. The vehicle, a 2005 Acura, had a Pennsylvania dealer's tag on it. Detective Stewart stopped the vehicle because he suspected that the car's window tint violated Maryland law. *See* Maryland Code (2020 Repl. Vol.), § 22-406(i) of the Transportation Article ("Trans.").

At the outset of the stop, the defendant was cooperative. But, when the officer began a pat down of the defendant, a scuffle ensued and the defendant drove off in his car, dragging the officer. The defendant quickly struck another vehicle and then a utility pole. After the second crash, Officer Stewart was able to subdue the defendant. From inside the defendant's pants, he recovered an unholstered, loaded firearm with an extended magazine. Contraband was subsequently recovered from the vehicle, including 111 vials of crack cocaine, a 13-gram chunk of crack cocaine, two cellphones, and 36 rounds of 9 mm ammunition. *See* Stipulation, ECF 67-1.

Defendant has moved to suppress all of the evidence. ECF 28 (the "Motion"). The government opposes the Motion. ECF 32. And, the defendant replied. ECF 43. The parties also filed supplemental submissions. *See* ECF 52; ECF 58; ECF 62; ECF 73; ECF 75; ECF 76.

The Court held an evidentiary hearing on August 7, 2023, at which Detective Stewart was the sole witness. ECF 66. At the hearing, both sides introduced multiple exhibits, including the body worn camera footage of Detective Stewart (Government's Exhibit 1; Defendant's Exhibit 1)

and BPD Detective Michelle Burke (Defendant's Exhibit 11), who arrived at the scene shortly after the incident.[2]  A transcript from the hearing is docketed at ECF 79.

During the hearing, the government learned of a written statement prepared by Detective Stewart on May 15, 2022, in connection with the BPD's investigation of his use of force during the occurrence.  Accordingly, the defendant reserved the right to reopen the hearing upon receipt of the statement.  *See*, *e.g.*, ECF 79 at 67, 69, 130, 131, 132, 209.

The government subsequently obtained Detective Stewart's statement of May 15, 2022, and provided it to the defense.  *See* Defendant's Exhibit 17.  Thereafter, on September 18, 2023, the Court held another evidentiary hearing, limited to the matter of Detective Stewart's written statement.[3]  Detective Stewart was the only witness.[4]

In sum, the defendant contends that Detective Stewart had no legal basis to stop the vehicle for a tint violation, because the vehicle had a Pennsylvania dealer's license and thus was not subject to Maryland's tint law.  Moreover, in view of conflicting judicial precedent, the defendant contends that the good faith doctrine does not apply to the stop.  In addition, the defendant contends that Detective Stewart illegally searched the vehicle by opening the driver's side door to obtain the Vehicle Identification Number.  Further, the defendant contends that Detective Stewart's pat down of the defendant was illegal, because the officer lacked reasonable, articulable suspicion that the

---

[2] There is some duplication of exhibits.  In the event of duplication, I generally provide only one citation.

[3] The defendant asked the Court to consider the statement, but without reopening the hearing.  *See* ECF 73.  The government opposed the request for consideration of the statement without the opportunity to question the officer.  *See* ECF 75.  The defense replied.  ECF 76. Following a conference with counsel on August 30, 2023, I determined that it was appropriate to reopen the hearing.  *See* ECF 81.

[4] I do not have a transcript of the second hearing.   Therefore, I have relied on my notes. To the extent that I include any quotes, they are not verbatim.

defendant was both armed and dangerous.  The defendant also maintains that the intervening misconduct of the defendant does not alter the analysis.  And, the defense challenges the credibility of Detective Stewart, particularly with respect to his justification for the pat down.

The government claims that the traffic stop was lawful.  But, in any event, the government maintains that the good faith doctrine applies.  Further, the government contends that the officer's conduct in opening the car door and in patting down the defendant was lawful.  However, even assuming that the stop and/or the pat down was unlawful, the government posits that defendant's conduct in fleeing was an intervening event that vitiated any prior illegality.  And, according to the government, after the car crash, the gun was recovered in connection with a lawful search of the defendant, incident to his arrest.  Moreover, because the vehicle had to be towed as a result of the occurrence, the government contends that the police were required to conduct an inventory of the contents of the vehicle and therefore the inevitable discovery doctrine applies.  Alternatively, the government argues that the contraband in the vehicle was in plain view.

For the reasons that follow, I shall deny the Motion.[5]

## I.    Video Evidence

As noted, the evidence includes the body worn camera footage of Detective Stewart.  In addition, Detective Burke activated her body worn camera when she interviewed Detective Stewart.  To be sure, these are important pieces of evidence.

---

[5] "Motions to suppress fall into the class of issues that are decided by the court and not the jury."  *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005) (citing Fed. R. Crim. P. 12(b)(3)(C), 12(d); Fed. R. Evid. 104(a)).  "In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law."  *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing *Stevenson*, 396 F.3d at 541).

In the factual summary that follows, I consider the testimonial evidence of Detective Stewart, the parties' exhibits, and the video evidence. But, this is not a case in which the Court can rest its decisions solely on the video evidence.

Detective Stewart's camera lens provides a limited view of the events it captured. In other words, its depictions reflect one angle from one lens.

In general, if a party's account of events is contradicted by the video evidence, a court should view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also United States v. Kehoe*, 893 F.3d 232, 240 (4th Cir. 2018). But, *Scott* does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers *some* support for [the other side's] version of events." *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011) (emphasis in *Witt*); *see also Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 396-9 (2015), *as recognized by Brooks v. Johnson*, 924 F.3d 104 (4th Cir. 2019).

## II.    Factual Summary[6]

Detective Stewart graduated from the police academy in March 2019, and has been a Baltimore City police officer for approximately five years. ECF 79 at 16. At the time of the occurrence, he was already a detective, assigned to the Mobile Metro Unit, a citywide unit that is "deployed to high crime areas . . . to deter crime using traffic enforcement." *Id.* at 17; *see also id.*

---

[6] In general, I quote from the testimony of Detective Stewart at the hearing, rather than his body worn camera, because I have a hearing transcript but I do not have a transcript for the video. Although the words are not identical, they are consistent, unless otherwise noted. In addition, where indicated, I have included some information detained from the video that was not elicited at the hearing.

at 109.  The unit "proactively" attempts to "determine if there's any criminal activity afoot" and uses the traffic code as a "mechanism" to do so.  *Id.* at 109.

During Detective Stewart's career, he has received "hours of" training on Maryland traffic laws, including the use of window tinting.  *Id.* at 18.  He has also made hundreds of traffic stops for violations of Maryland traffic laws.  *Id.*  Detective Stewart explained that tinting restrictions serve as a safety precaution for drivers and also for police officers, who must be able to see inside a vehicle.  *Id.* at 20-21.

Detective Stewart testified that, in order for the tinting of a windshield to be legal, during daylight one should be able to see inside the vehicle.  *Id.* at 18-19.  And, he said, *id.*:  "If you see your own reflection, it's over the limit."  In addition, there are parameters for the proper location of the tinting, according to Detective Stewart.  *Id.* at 19-20.  With respect to a passenger car, "no windshield tint is allowed below the AS-1 line."  *Id.* at 20.

Detective Stewart claimed that he was trained not to stand "in the pathway of the vehicle" during a traffic stop, in case it moves.  *Id.* at 21.  He also testified that it is illegal in Maryland to drive without a valid license.  *Id.* at 23.  And, he explained that, to operate a vehicle with a dealer's tag, a driver must have a dealer's license, which is available to an employee or agent of a dealership or the owner of the dealership.  *Id.* at 22.  Further, Detective Stewart noted that, to sell a vehicle in Maryland, the vehicle must pass a Maryland State inspection, which means the vehicle cannot have an illegal tint.  *Id.* at 23.

According to Detective Stewart, if a vehicle is unregistered and the driver is unlicensed, "the vehicle cannot stay on the roadway."  *Id.*  Rather, BPD policy requires towing of any vehicle that "is disabled, unable to be operated safely on a roadway . . . ."  *Id.*  This includes when the operator is not available.  *Id.*  Moreover, he testified that, prior to towing, BPD policy requires an

inventory search to account for all items in the vehicle.  *Id.* at 23-25.  He explained that this is for safety and to protect any valuables that might be in the vehicle.  *Id.* at 25.  The government introduced the applicable BPD towing policy, Policy 902.  *Id.* at 25-26; *see* Government's Exhibit 7.

Detective Stewart has made more than 100 firearm seizures.  *Id.* at 27.  He described his training with respect to narcotics and firearms, including the requirements in Maryland for carrying a weapon.  *Id.* at 26-29.  According to Detective Stewart, in order to own and carry a handgun in Maryland, an individual must have a handgun qualification license ("HQL").  *Id.* at 27.  He claimed that a person who is lawfully carrying a firearm would know to produce a "HQL" if stopped by a police officer, would inform the officer that he or she is armed, and would indicate "where exactly it is in the car or if it's on their person."  *Id.* at 28.

Moreover, Detective Stewart described characteristics of an individual who is armed but who "is not completely trained on how to handle a firearm," *id.* at 27, or does not have "the proper equipment for a firearm . . . ."  *Id.* at 28.  He stated that these persons "do certain maneuvers," such as a "security check" when a weapon is not holstered, and "blading," which involves turning one's body away from a law enforcement officer.  *Id.*  He also contrasted a standard gun magazine with an extended one.  In particular, Stewart explained that a standard magazine is "created" by the gun manufacturer and is "close to flush" on the firearm, but an extended magazine, which holds additional ammunition, "is much longer," so "you can see it."  *Id.* at 29.

On May 15, 2022, at approximately 2:48 p.m., Detective Stewart was in the area of the 1500 block of North Patterson Avenue in Baltimore City, which he described as a "high crime area" because of drug trafficking and violent crimes that occur there.  *Id.* at 30.  Detective Stewart was alone in an unmarked vehicle, but he was in police uniform.  *Id.* at 31, 85, 96.  He saw the

defendant in the 1600 block of North Patterson Avenue.  *Id.* at 32.  Brandon was driving a 2005 blue Acura TL,[7] bearing a Pennsylvania dealer's tag.  *Id.* at 32, 35.  Detective Stewart noticed the Pennsylvania dealer's tag "once [he] was behind the vehicle . . . ."  *Id.* at 35.

Detective Stewart described the windows of the Acura as "completely tinted out," such that he could not "see inside the vehicle at all."  *Id.* at 32.  Moreover, the officer explained that the vehicle was tinted "way below the AS-1 line."  *Id.* at 34.  However, Detective Stewart did not have a tint meter with him to measure the degree of tinting.  *Id.* at 33.  Instead, he relied on his training and experience, including that he could not "see how many people occupied the vehicle or anything inside of it."  *Id.*

Government's Exhibit 2 is a photograph of the vehicle.  Government's Exhibit 3 is a photograph of the Pennsylvania dealer tag.  *See also* ECF 79 at 36, 37.  The officer thought that the dealer's tag "seem[ed] out of place," *id.* at 35, because a vehicle cannot be sold if it cannot pass inspection.  *Id.* at 35, 36.  And, he stated that the vehicle "wasn't fitted properly" so as "to be sold," and its condition was "inconsistent" with dealer tags.  *Id.* at 36.

Prior to the officer's interaction with the driver of the Acura, Detective Stewart ran the Acura's vehicle tag through the National Crime Intelligence Center ("NCIC") database.  *Id.* at 37.  The officer learned that the tag belonged to a dealer in Pennsylvania, but he could not associate the tag with the vehicle.  *Id.* at 37, 38.  Government's Exhibit 4 is the dealership information that Stewart obtained from NCIC at the scene.  *Id.* at 38, 39.

At that point, Detective Stewart activated his lights and siren and used his "in-car PA system to order the driver to lower the windows down."  *Id.* at 39.  He also "put out" the "location

---

[7] In Stewart's Use of Force statement of May 15, 2022, he identified the vehicle as an Acura "TLX."  However, at the hearing he said "TL."

of the stop . . . ." *Id.*  The officer then approached the Acura while also activating his body worn camera.  *See* Government's Exhibit 1 at 1:01.

Brandon was the sole occupant of the Acura.  As directed, he lowered the front driver's side window.  ECF 79 at 39.  Detective Stewart introduced himself to Brandon and asked Brandon for "identifying documentation, license and registration."  *Id.* at 40.  The defendant could not provide the officer with a vehicle registration and stated that he did not have a driver's license.  *Id.* But, Brandon provided his name and date of birth.  *Id.*  He also stated that the tag belonged to his brother.  Government's Exhibit 1 at 1:40.

Detective Stewart informed the defendant that he would be opening the driver's side door to obtain the vehicle identification number ("VIN") for the vehicle.  *Id.*  He also asked Brandon if there was anything in the vehicle that could "stick" or "poke" the officer or "hurt" the officer in any way, and Brandon responded in the negative.  *Id.*; *see also id.* at 100.

The officer explained that a VIN is "personalized to one vehicle," and can be found in several places on a car, including the front windshield.  *Id.* at 40-41.  However, the officer explained that he did not want to retrieve the VIN from the windshield of the Acura, because he did not want to step in front of the vehicle for safety reasons.  *Id.* at 41.  Instead, he located the VIN on the car door, photographed it, and then immediately shut the door.  *Id.*  He then returned to his police vehicle, where he ran the VIN through NCIC.  *Id.* at 41.  Stewart explained that although NCIC can access "MVA records," he was unable to obtain any information about the vehicle.  *Id.* at 42.

According to Stewart, the "next step" was "to run the driver's information."  *Id.*  Stewart confirmed that Brandon did not have a driver's license.  *Id.*  At that point, the officer took "into account" what he was "faced with, which is an unregistered vehicle on the roadway [and] an

unlicensed driver . . . ." *Id.*  He also determined that he could not permit the defendant to operate the vehicle.  *Id.* at 43.  In Detective Stewart's view, he had "no choice" but to have the vehicle towed.  *Id.*  Stewart also stated that BPD policy "is to try to take the least intrusive method which is to cite before arrest." *Id.* at 23.

Detective Stewart returned to the Acura and asked the defendant "to step out" of the car. *Id.* at 42.  Stewart testified that, when Brandon exited the vehicle, he saw "a bulge of the shape and size of what [he] believed to be a handgun . . . ." *Id.* at 43.  It was on the defendant's right side, on his right thigh, in the crotch area.  *Id.* at 44.  Stewart acknowledged that he did not see the weapon "directly," but he saw the object through the defendant's clothes.  *Id.*  According to Stewart, "the magazine was extended down to the right side of [the defendant's] pants." *Id.*

At the hearing, the officer recalled that the defendant exited the vehicle with "a normal pace with his left leg" but a "slower pace" with his right leg.  *Id.* at 43.  Detective Stewart also asserted that the defendant was "blading" when he exited the car, *i.e.*, the defendant "turned his body away from [the officer], pointing himself into the angle between the driver's side door and the frame of the body of the vehicle." *Id.*  As discussed earlier, Stewart described blading as a maneuver of an individual who is armed.  *Id.* at 28-29.

On cross-examination, Detective Stewart reiterated that, when the defendant stepped out of the vehicle, he saw an L-shaped bulge on Brandon's right leg.  *Id.* at 109.  The officer also recalled that the defendant "stiffed armed his right arm down in front of him," *id.* at 103, and he also maintained that the defendant was turning away from the officer as he exited the car.  *Id.*

Detective Stewart stated that, as defendant exited the vehicle, he again asked the defendant if "he had anything on him," and he then "began to do a weapons pat-down." *Id.* at 44.  The video

depicts the pat down from the back of the defendant.  During the pat down, Stewart found the bulge in defendant's front.  *Id.* at 109.

The video footage is consistent with the officer's description of "blading" by Brandon.  *See* Government's Exhibit 1 at 5:00.  In addition, the video shows that the defendant was wearing close-fitting jeans.  And, there is a bulge that is briefly visible in the video, on the upper portion of the defendant's right leg.  *Id.* at 5:05.

According to the video, as the officer reached the defendant's waist area, he asked words to the effect of "what's this?"  *Id.* at 5:02.  The defendant did not answer.  *See id.*  The officer recounted that the defendant then attempted "to grab the firearm."  ECF 79 at 44, 45.  While Brandon was reaching for the weapon, he was able "to slide and maneuver his body" into the driver's seat of the Acura.  *Id.* at 45.  A struggle ensued, and the officer was thrown against the car.  *Id.*  The officer managed to transmit a distress signal over the police radio.  *Id.*  Then, the defendant drove off, with the officer's torso in the car and his legs outside the vehicle.  *Id.* at 48.  The defendant quickly struck an occupied vehicle.  *Id.* at 46, 49, 51.  As Detective Stewart tried to gain control of the vehicle, the defendant struck a telephone pole.  *Id.* at 51.  At that point, the vehicle came to a stop and Stewart was able to subdue the defendant.

In response to Detective Stewart's radio call for help, other police officers promptly arrived at the scene.  *Id.* at 52; *see also* Government's Exhibit 1 at 5:20-6:36.  While the defendant was still in his vehicle, Detective Stewart "unbuttoned" the defendant's pants, ECF 79 at 52, and "grabbed the firearm" from defendant's "waistband."  *Id.* at 53.  The weapon was not holstered. *Id.* Notably, an extended magazine stuck out well beyond the end of the weapon.  *Id.* at 55.

Government's Exhibit 8 is a photograph of the weapon and a total of 30 rounds of ammunition.  *See also* ECF 79 at 53, 54.  One round of ammunition was in the chamber and the

extended magazine was loaded with 29 rounds.  *Id.* at 54.  According to Detective Stewart, at that time he also saw narcotics "in the rear of the vehicle in the backseat."  *Id.* at 52.

Stewart testified that, because of the vehicular crash, "departmental policy" required towing of the vehicle.  *Id.* at 55.  Before towing, however, an inventory search must be conducted. *Id.* at 24-25.  Stewart was not involved in the search of the vehicle.  *Id.* at 55.

Detective Stewart recounted that he hit his head on the roof of the vehicle during the first impact and on the windshield during the second impact.  *Id.* at 55.  He was transported to the hospital by ambulance and was diagnosed with a concussion.  *Id.* at 55-56.  As a result, he did not write any reports, except in regard to his use of force.  *Id.* at 56-57.

While at the scene, Detective Stewart spoke to the Officer in Charge ("OIC"), Detective Christian Schaeffer.  *Id.* at 105.  While Stewart was in the ambulance, he spoke to Detective Burke. *Id.* at 106.

On cross-examination, Stewart was asked if he told Burke that he was "in the process of moving Mr. Brandon to the passenger seat of the car, and that's why [he] had [Brandon] step out of the vehicle."  *Id.* at 107.  Stewart responded:  "I do not recall."  *Id.*  Nor did the officer recall providing that information to the OIC.  *Id.*  However, Stewart can be heard on his body camera video explaining to the OIC that he had planned to have the defendant sit in the passenger seat. Government's Exhibit 1 at 10:03.  But, as discussed *infra*, in a statement that Stewart prepared on the date of the incident (Defendant's Exhibit 17), he stated that he planned to have the defendant wait "on the curb . . . ."

During cross-examination, Detective Stewart claimed that he was not familiar with either the Statement of Probable Cause or the application for charges in the case, because they were prepared by Detective Burke.  ECF 79 at 81; *see* Defendant's Exhibit 4; Defendant's Exhibit 5.

12

He added that the reports were prepared and processed while he was hospitalized.  ECF 79 at 87.

Moreover, Detective Stewart claimed that he did not speak to Detective Burke in connection with

her preparation of the reports, but thought she gleaned the information included in her reports by

watching the body camera video.  *Id.*

Detective Stewart reviewed the Incident Report before testifying at the hearing.  *Id.* at 82.

The Incident Report was also prepared by Detective Burke.  *Id.*; *see* Defendant's Exhibit 6.

In both the Statement of Probable Cause (Defendant's Exhibit 5) and in the Incident Report

(Defendant's Exhibit 6), Detective Burke reported that Brandon stepped out of his vehicle "but

immediately turned himself away from Detective Stewart and held his right arm stiff down in front

of him."  Moreover, Burke wrote:  "Based on the blading of his body away from Detective Stewart

and his stiff arm, Detective Stewart suspected that Mr. Brandon might be in possession of a

firearm.  Based on Detective Stewart's knowledge of the characteristics of an armed person, he

conducted a weapons pat-down of Mr. Brandon."  *Id.*  The defense highlighted that Detective

Burke made no reference to an alleged observation by Detective Stewart of a bulge in the

defendant's pants, consistent with the shape of a gun.

The defendant introduced BPD Policy 102.  ECF 79 at 78; *see* Defendant's Exhibit 10.  It

provides, *inter alia*, that BPD members must comply with all BPD policies.  *See* ECF 79 at 79;

Defendant's Exhibit 10 at 2.  In addition, the defendant introduced BPD Policy 906, titled "Traffic

Citations."  ECF 79 at 79-80; *see* Defendant's Exhibit 9. Among other things, BPD Policy 906

states:  "Considering the circumstances presented at the time, members should always take the

least intrusive action, consistent with the goal of public safety.  For most minor violations,

warrantless arrest is not the preferred option . . . ."  Moreover, Policy 906 states, *id.*:  "A member

should issue a citation or make an arrest only when doing so directly advances the goal of public safety . . . ."[8]

BPD policy permits an officer to issue a warning to someone who is driving without a valid license.  *Id.* at 107.  But, the officer can also decide, in his discretion, to arrest that individual.  *Id.* at 107-08.  In other words, Detective Stewart could have arrested the defendant for the offense of driving without a license.  Nevertheless, he did not intend to do so.

The defense established that, at the outset of the pat down, the officer did not handcuff the defendant, advise him that he was under arrest, or instruct him to put his hands on the car or his head.  *Id.* at 104.  Nor did Detective Stewart advise the defendant of his *Miranda* rights, *id.*, or call for backup.  *Id.* at 105.  These facts support the officer's claim that he did not intend to arrest the defendant for the arrestable offense of driving without a license.  And, Stewart never broadcast on the police radio that he saw a firearm.  *Id.*

Detective Stewart was investigated by the BPD's Internal Affairs Division ("IAD") for his use of force against Brandon inside the vehicle.  *Id.* at 115.[9]  The defense elicited that Stewart told an IAD investigator that he obtained the VIN from the car door because he could not see the VIN on the windshield, due to the extent of the tint.  *Id.* at 98.  But, as noted, Stewart testified on direct examination that he did not obtain the VIN from the windshield because he did not want to put himself "in harm's way."  *Id.* at 41.  Stewart disputed that his statements were contradictory.  He reiterated that the "windshield was completely tinted all the way down . . . ."  *Id.* at 99.  And, he explained, *id.*:  "[S]o I wasn't going to put myself at risk by even trying to venture to that part of

---

[8] Stewart's testimony on direct examination was consistent with the instructions in Policy 906.

[9] The IAD investigates matters concerning alleged police misconduct.

the vehicle to take a look to see if it was there."  Nonetheless, he agreed that he had told IAD that he could not see the VIN on the windshield.  *Id.*

Initially, however, Stewart did not report his use of force.  *Id.*  And, he was represented by a lawyer when the case was referred to IAD.  *Id.*  Moreover, he was not under oath when he was interviewed by IAD.  *Id.* at 115-16.

BPD Policy 1115 is titled "Use of Force."  *See* Defendant's Exhibit 15; ECF 79 at 116. The use of force in this case was classified as a level three use of force, *i.e.*, deadly force, because the officer was accused of using a chokehold.  *Id.* at 116-17.  However, Detective Stewart denied that he choked Brandon.  And, he claimed that he did not immediately report his use of force, as required, *id.* at 117-18, because he had just gone through "a traumatic incident" and he could not "recall every event immediately."  *Id.* at 118.  Indeed, Stewart reported that he "just held [Brandon's] hands the entire time."  *Id.*

Stewart described his own conduct as "an arrest and control technique," which was part of his training.  *Id.* at 119.  However, he claimed that BPD policy has changed since his training.  *Id.* at 20-21.

According to Stewart, under current BPD policy, "any type of touching within the neck area" is considered a chokehold.  *Id.* at 119.  But, Stewart maintained that, under "standard practice," a chokehold "cuts off blood flow, airway, or anything like that . . . ."  *Id.* at 119-120. And, he disputed that his hand was "directly applied" to Brandon's throat.  *Id.* at 120.  The video seems to reflect otherwise.  *See* Government's Exhibit 1 at 6:18.

The matter of Detective Stewart's use of force was referred to the State's Attorney for Baltimore City, but the State declined to prosecute.  ECF 79 at 113-14.[10]  According to the government, the officer has "been cleared" of wrongdoing.  *Id.* at 122.

As to the process of using a dealer's tag, Detective Stewart explained that the tag enables either the dealer or an agent of the dealer to "drive that car to a person they're selling it to or to another dealer, or wherever they're moving the vehicle ultimately."  *Id.* at 101.  The defense confirmed that Officer Stewart learned that the tag belonged to a dealership and had an expiration date of August 31, 2022.  *Id.* at 102.

As noted, the evidence was reopened on September 18, 2023, for the limited purpose of addressing the written statement prepared by Detective Stewart on May 15, 2022, in regard to his use of force on that date.  *See* Defense Exhibit 17.  In that statement, Stewart said that he initiated a traffic stop because of "an illegally tinted windshield . . . ."  *Id.*  The officer noted that, due to the tint, he could not see how many persons were in the vehicle.  *Id.*  Stewart recounted that he opened the car door to obtain the VIN, and asked the defendant "if he had anything to potentially harm" the officer.  *Id.*  Brandon responded in the negative.  Stewart also photographed the VIN.  *Id.*

Stewart explained that after he verified that the defendant did not have a driver's license, and that there was no vehicle information available based on the VIN, Stewart determined that Brandon was "unable to operate a vehicle."  *Id.*  He recounted that he approached Brandon with the intention of informing him of what he "found" and to "have him get out of the vehicle to sit on

---

[10] At one point during cross-examination, the Court interjected that the defendant was attempting to provide a more fulsome response.  ECF 79 at 117.  However, the transcript incorrectly uses the word "wholesome," rather than "fulsome."  *Id.*

the curb until someone with a valid license can come to operate the vehicle." *Id.*  Therefore, he "ordered" Brandon out of the vehicle.  *Id.*

According to the statement, Brandon "removed his left leg . . . in a normal motion but stiff legged his right leg." *Id.*  Stewart also reported that, once Brandon was out of the vehicle, Brandon "bladed his body away from" Stewart.  *Id.*  And, based on Detective Stewart's training, knowledge and experience with prior firearm arrests, he "had reason to believe that Mr. Brandon was possessing and concealing a weapon." *Id.*

Notably, the statement fails to mention that Stewart saw a bulge on the defendant that was consistent with a firearm.  Nor does the statement reference any conduct on the defendant that constituted stiff-arming.

In the statement, Detective Stewart reported that he again asked Brandon if he had weapons on him, and he then "proceeded to do a weapons pat-down." *Id.* at 2.  According to the statement, as Stewart "ran [his] hands across the front of [the defendant's] waistband, [he] felt what [he] believed to be a handgun . . . ." *Id.*  Then, "[w]ithout warning", Brandon "immediately grabbed" the officer's hands and sought "to retrieve the firearm." *Id.*  Stewart asserted that the defendant entered the defendant's vehicle, placed the car "in drive," and "stomped on the accelerator." *Id.*  As Brandon began to drive away, he was "dragging" the "lower half" of Stewart's body as the two struggled for control of the vehicle and the gun.  *Id.*  Stewart managed to issue a "signal 13" call for help.  *Id.*

The statement details the struggle that ensued in the vehicle.  *Id.*  Stewart claimed that he was "fearful of losing control of the gun, vehicle, and ultimately [his] life." *Id.*  He acknowledged that he placed his left hand "around [the defendant's] neck area." *Id.*  But, he stated that he then removed his left hand and placed his right arm on the defendant's chest and gained control of

defendant's right hand. *Id.* He then held the defendant until other officers arrived. *Id.* Thereafter, Stewart recovered the loaded gun from inside the defendant's waistband. *Id.*

At the hearing, Stewart explained that the focus of his statement was his use of force. He also noted that, at the time, he was recovering from a concussion and that the statement was "not about the arrest" or the reasons for it.

Additional facts are included, *infra*.

### III. Discussion

### A. Traffic Stops and the Fourth Amendment

The Fourth Amendment to the Constitution guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Thus, the Fourth Amendment protects against unreasonable searches and seizures. *See Utah v. Strieff*, 579 U.S. 232, 237-38 (2016); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980).

By its plain text, however, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Illinois v. Rodriguez*, 497 U.S. 177, 183-84 (1990); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Mendenhall*, 446 U.S. at 551. Thus, "'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted)); *see also Fernandez v. California*, 571 U.S. 292, 298 (2014); *Maryland v. Wilson*, 519 U.S. 408, 411 (1997); *Jimeno*, 500 U.S. at 250; *United States v. Aigbekaen*, 943 F.3d 713, 719-20 (4th Cir. 2019).

The "test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331 (1990). As the Supreme Court explained in *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam): "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)); *see United States v. Sokolow*, 490 U.S. 1, 9 (1989); *see also United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018) ("The magnitude of the intrusion relative to the seriousness of any offense 'is of central relevance to determining reasonableness[.]'") (quoting *Maryland v. King*, 569 U.S. 435, 446 (2013)).

In *Santos v. Frederick County Bd. of Com'rs*, 725 F.3d 451 (4th Cir. 2013), the Fourth Circuit summarized "three categories of police-citizen encounters," *id.* at 460-61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434[] (1991). Second, brief investigative detentions—commonly referred to as "*Terry* stops"—require reasonable, articulable suspicion of criminal activity. *Terry* [*v. Ohio*, 392 U.S. 1, 21 (1968)]. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152[] (2006).
>
> A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16 [ ]). This inquiry is objective, [*United States v.*] *Weaver*, 282 F.3d [302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 678 F.3d at 299 (quoting *Mendenhall*, 446 U.S. at 553 [ ]). An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place. *United States v. Gray*, 883 F.2d 320, 323 (1989); *see*

*also Bostick*, 501 U.S. at 434[ ] ("[M]ere police questioning does not constitute a seizure.").

When a police officer stops an automobile and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment. *Kansas v. Glover*, ___ U.S. ___, 140 S. Ct. 1183, 1187 (2020); *United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021); *United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021); *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc); *see, e.g., Brendlin v. California*, 551 U.S. 249, 255 (2007); *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Sharpe*, 470 U.S. at 682; *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020); *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018); *United States v. Sowards*, 690 F.3d 583, 588-89 (4th Cir. 2012); *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015).

Generally, warrantless seizures and searches are per se unreasonable, subject only to a few well established exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Riley*, 573 U.S. at 382 (stating that, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement"); *Kentucky v. King*, 563 U.S. 452, 459-60 (2011). The government bears the burden of justifying a warrantless seizure. *Feliciana*, 974 F.3d at 523; *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018); *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

What has become known as the "*Terry* stop and frisk" is one of the exceptions to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1 (1968). The seminal case of *Terry v. Ohio* permits a police officer to stop and temporarily detain an individual for investigative purposes, without violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, so

long as the officer has a reasonable, articulable suspicion, based on specific facts, that criminal activity is afoot. *Id.* at 30; *see United States v. Peters*, 60 F.4th 855, 862 (4th Cir. 2023). Therefore, the stop "must be justified by reasonable suspicion of criminal activity or some other exception" to the warrant requirement. *Feliciana*, 974 F.3d at 522; *see United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Reid v. Georgia*, 448 U.S. 438, 440 (1980); *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015); *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011). The purpose of a *Terry* stop is investigative — to verify or to dispel the officer's suspicion surrounding the suspect. *Terry*, 392 U.S. at 22, 30.

With respect to a frisk, discussed in more detail, *infra*, the police officer must have a reasonable suspicion that the suspect is both armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). But, certainty is not required. *Terry*, 392 U.S. at 27.

In general, a traffic stop begins when a car "is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. at 333. The Supreme Court has said that "the usual traffic stop is more analogous to a so-called 'Terry stop,' . . . than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see Rodriguez*, 575 U.S. at 354; *Knowles v. Iowa*, 525 U.S. 113, 117 (1998). Fourth Circuit law is to the same effect. *See United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (A vehicle stop is "more akin to an investigative detention than a custodial arrest"); *see also United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019). Because a traffic stop is a seizure, it is subject to the Fourth Amendment's reasonableness requirement. *Whren*, 517 U.S. at 810; *Prouse*, 440 U.S. at 653. "[T]o pass constitutional muster," the officer must have "a constitutionally adequate basis" for it. *United States v. White*, 836 F.3d 437, 440-41 (4th Cir. 2016), *abrogated on other grounds by United States v. Stitt*, ___ U.S. ___, 139 S. Ct. 399 (2018).

Reasonable suspicion requires "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Glover*, 140 S. Ct. at 1187 (citation omitted); *see Ornelas v. United States*, 517 U.S. 690, 696 (1996) (stating that reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ."); *see also Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021); *Feliciana*, 974 F.3d at 523; *Williams*, 808 F.3d at 246; *United States v. Black,* 707 F.3d 531, 539 (4th Cir. 2013); *Massenburg*, 654 F.3d at 486; *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009).  But, it "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," although a "minimal level of objective justification [is required] for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see Glover*, 140 S. Ct. at 1188; *United States v. Critchfield*, 81 F.4th 390 F.4th 393 (4th Cir. 2023); *United States v. Lawing*, 703 F. 3d 229, 236 (4th Cir. 2012); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000).

Reasonable suspicion is an "objective standard."  *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014).  Therefore, the officer's subjective state of mind is not considered.  *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013), *cert. denied*, 572 U.S. 1009 (2014); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011).

Notably, the matter of reasonable, articulable suspicion is sometimes elusive.  The Supreme Court has acknowledged the difficulty in pinpointing exactly what is meant by the term "articulable suspicion."  *Ornelas*, 517 U.S. at 699-700.  Moreover, it has recognized that the standard is "'not readily, or even usefully, reduced to a neat set of legal rules.'"  *Id.* at 695-96. However, "the detaining officer [must] '. . . either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be

indicative of some more sinister activity than may appear at first glance.'" *Williams*, 808 F.3d at 246 (citation omitted).

The standard "'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'" *Glover*, 140 S. Ct. at 1188 (citations omitted) (emphasis added in *Glover*). Moreover, officers must be permitted to make "'commonsense judgments and inferences about human behavior.'" *Id.* (citation omitted); *see Navarette v. California*, 572 U.S. 393, 404 (2014). Therefore, in assessing reasonable suspicion, courts must "give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also Glover*, 140 S. Ct. at 1189; *Critchfield*, 81 F.4th at 393; *Feliciana*, 974 F.3d at 525; *United States v. McBride*, 676 F.3d 385 (4th Cir. 2012); *Sowards*, 690 F.3d at 587-88; *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009). As the Fourth Circuit has said, the court "must not discount the officers' experience and training 'to detect the nefarious in the mundane.'" *Critchfield*, 81 F.4th at 395 (quoting *United States v. McCoy*, 513 F.3d 405, 415 (4th Cir. 2008)). However, a mere "'hunch'" or "'inchoate and unparticularized suspicion'" is not enough. *Wardlow*, 528 U.S. at 124 (citation omitted); *see Critchfield*, 81 F.4th at 393; *United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022).

In making this assessment, a court considers the totality of circumstances. *See Arvizu*, 534 U.S. at 273; *Peters*, 60 F.4th at 864; *Cloud*, 994 F.3d at 242. "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *George*, 732 F.3d at 299 (citing *Wardlow*, 528

U.S. at 124). And, "[f]acts innocent in themselves may together amount to reasonable suspicion." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020); *see Sokolow*, 490 U.S. at 9-10.

To be sure, "[t]he suspicion must be articulable . . . ." *Critchfield*, 81 F.4th at 393. But, "'[t]o be reasonable is not to be perfect.'" *Glover*, 140 S. Ct. at 1188 (citation omitted).

If a vehicle is being driven contrary to the laws governing the operation of motor vehicles, that generally gives rise to probable cause or reasonable, articulable suspicion of a crime. *Prouse*, 440 U.S. at 650; *Whren,* 517 U.S. at 817-18. In *Bernard*, 927 F.3d at 805, the Fourth Circuit reiterated: "'When an officer observes a traffic offense – however minor – he has probable cause to stop the driver of the vehicle.'" (quoting *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014)). And, "'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" *Ohio v. Robinette*, 519 U.S. 33, 38-39 (1996) (quoting *Mimms*, 434 U.S. at 111 n.6).[11]  The stop of the driver ordinarily does not violate the Constitution, so long as the stop is no longer than necessary to perform the traditional incidents of a routine traffic stop. *Rodriguez*, 575 U.S. at 350; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Prouse*, 440 U.S. at 650; *Branch*, 537 F.3d at 335.

Because a traffic stop is more akin to an investigative detention than a custodial arrest, the Supreme Court has adopted the dual inquiry standard articulated in *Terry*, 392 U.S. 1, to assess the constitutionality of the traffic stop. *See Arizona v. Johnson*, 555 U.S. at 330-31; *Bernard*, 927 F.3d at 805; *Bowman*, 884 F.3d at 209; *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016); *Williams*, 808 F.3d at 245; *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011). Under

---

[11] A passenger may also be required to exit a vehicle during a routine traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997).

the dual inquiry standard, the court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682; *see also Bernard*, 927 F.3d at 805; *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); *Williams*, 808 F.3d at 245; *Guijon-Ortiz,* 660 F.3d at 764.

But, "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016) (citation and internal quotation marks omitted); *see Peters*, 60 F.4th at 864. And, as the Fourth Circuit has said, "[i]t is the *police officer* who 'must be able to point to specific and articulable facts' — not a party's brief." *Id.* (citing *Terry*, 392 U.S. at 21) (emphasis added in *Peters*).

## B.  The Vehicle Stop

Defendant challenges the legality of the vehicle stop. He contends that the traffic stop violated the Fourth Amendment because "Maryland law simply does not regulate the tint of cars that are registered out of state." ECF 28 at 5; *see id.* at 6. According to Brandon, because Detective Stewart had no grounds to believe the Acura was registered in Maryland, he lacked either reasonable suspicion or probable cause to justify the stop of the vehicle for a window tint violation. *Id.* at 7.

Defendant relies, *inter alia*, on the plain text of § 22-406(i) of the Transportation Article of the Maryland Code; the Fourth Circuit's decision in *United States v. Frank Johnson*, 256 F.3d 214 (4th Cir. 2001); and the decision of Judge Chuang in *United States v. Brooks*, TDC-22-0428, 2023 WL 4157341 (D. Md. June 23, 2023). Moreover, the defendant contends that the good faith doctrine does not apply because of conflicting judicial precedent.

The government maintains that the officer was permitted to stop the vehicle to investigate whether it was subject to and in compliance with Maryland tint law.  ECF 32 at 1.  To support its position, the government relies, *inter alia*, on *Baez v. State*, 238 Md. App. 587, 192 A.3d 945 (2018), and *United States v. Davonta Johnson*, PWG-21-171, 2021 WL 5882570 (D. Md. Dec. 13, 2021).  Alternatively, the government relies on the good faith doctrine under *United States v. Leon*, 468 U.S. 897, 909 (1984), and its progeny.  *See* ECF 32 at 10.

In Maryland, vehicle tinting is governed by titles 22 and 23 of the Transportation Article of the Maryland Code and regulations adopted by the Maryland Department of Transportation ("MDOT"), found in the Code of Maryland Regulations ("COMAR").  With exceptions not pertinent here, Trans. § 22-101 prohibits a person from driving on any highway a vehicle that is equipped in any manner that violates Title 22.  Trans. § 22-101(a)(1)(i) is the general unsafe condition provision.  It provides, in pertinent part:  "A person may not drive and the owner may not cause or knowingly permit to be driven on any highway any vehicle or combination of vehicles that:  (i) Is in such unsafe condition as to endanger any person[.]"  And, pursuant to Trans. § 27-101(a), a violation of § 22-101 constitutes a misdemeanor.

Subtitle 4 of Title 22 of the Transportation Article establishes the requirements for certain kinds of vehicle equipment.  Of relevance here, Trans. § 22-406 is titled "Safety glazing material in motor vehicles."  With exceptions not pertinent here, Transp. § 22-406(i)(1)(i) prohibits a person from operating *a Maryland-registered passenger vehicle* on a highway in the State if "there is affixed to any window of the vehicle any tinting materials added to the window after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%."  Also of relevance here, Trans. § 22-406(i)(2) states:  "If a police officer observes that a vehicle is being operated in violation of paragraph (1) of this subsection, the officer may stop the driver of the

26

vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order in accordance with the provisions of § 23-105 of this article."

Trans. § 23-105(a)(1) is consistent with § 22-406(i)(2) and provides:  "If a police officer observes that a vehicle registered in this State is being operated with any equipment that apparently does not meet the standards established under this subtitle," the officer "shall stop the driver of the vehicle and issue to him a safety equipment repair order."

As noted, the MDOT has adopted regulations that pertain to vehicle tinting.  COMAR 11.14.02.14 is titled "Vehicle Glazing."  In § A, it provides, in part:  "Only ASI or ASI0 may be used in the windshield."  Under "Procedures," it states in § A(4)(a)(i) that for passenger cars, tinting must be "above the ASI line or within 5 inches from the top of the windshield, whichever is less . . . ."  Moreover, the windshield is required to have a label from the tinting manufacturer as to "the percentage of light transmittance," which must be "at least 35 percent."  *Id.*

In sum, the State permits after-market window tinting of passenger vehicles if, among other things, the tinting allows at least 35% light transmittance and the tinting is "above the ASI line . . . ."  If a police officer observes a Maryland vehicle that is not in compliance with the tinting requirements, the officer may stop the vehicle and issue both a citation for the traffic offense and a vehicle equipment repair order.

The purpose of the tint regulation derives from concerns about officer safety in the context of traffic stops.  Traffic stops are "especially fraught with danger to police officers."  *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).  And, tinted windows "pose" a "grave risk" to the safety of law enforcement officers during a lawful traffic stop, because an officer cannot see inside a vehicle that has "heavily tinted windows."  *United States v. Stanfield*, 109 F.3d 976, 978 (4th Cir. 1997).

In *Stanfield*, the Fourth Circuit considered, *inter alia*, whether, during a traffic stop, a police officer may lawfully open a car door of a vehicle with "heavily tinted windows" in order to see inside the vehicle.   *Id.*   The Court observed, *id.*:   "Law enforcement officials literally risk their lives each time they approach occupied vehicles during the course of investigative traffic stops. . . ."   The Court elaborated, *id.* at 981-82 (emphasis in *Stanfield*):

> When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. *Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.* As the officer exits his cruiser and proceeds toward the tinted-windowed vehicle, he has no way of knowing whether the vehicle's driver is fumbling for his driver's license or reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants. He literally does not even know whether a weapon has been trained on him from the moment the stop was initiated. As one officer put the obvious: "If the suspect has a weapon, I might not see it until he rolls down the window. He may just shoot me through the window."[] If, as the Court has noted, officers face an 'inordinate risk' every time they approach even a vehicle whose interior and passengers are fully visible to the officers, *[Pennsylvania v.] Mimms*, 434 U.S. [106] at 110 (1977)], the risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable. In fact, it is out of recognition of just such danger that at least twenty-eight states, including Maryland, have now enacted laws either regulating or altogether prohibiting the use of tinted windows on vehicles in their states.

Thus, the *Stanfield* Court concluded, *id.* at 981:

> [W]henever, during a lawful traffic stop, officers are required to approach a vehicle with windows so heavily tinted that they are unable to view the interior of the stopped vehicle, they may, when it appears in their experienced judgment prudent to do so, open at least one of the vehicle's doors and, without crossing the plane of the vehicle, visually inspect its interior in order to ascertain whether the driver is armed, whether he has access to weapons, or whether there are other occupants of the vehicle who might pose a danger to the officers. Indeed, it seems to us that a contrary holding would not only be irreconcilable with, but arguably undermine altogether, the caselaw from the Supreme Court that was developed specifically for

the purpose of protecting officer safety during what are, in today's society, frighteningly perilous encounters.

I turn to consider the validity of Detective Stewart's decision to conduct a traffic stop of defendant on the ground that, in the officer's view, the vehicle's window tinting did not comply with Maryland law.

In *State v. Williams*, 401 Md. 676, 934 A.2d 38 (2007), the Maryland Court of Appeals[12] recognized that post-manufacture tinting of motor vehicles is regulated largely at the state level and standards vary from state to state. *Id.* at 683. In a four to three decision, the majority generally acknowledged that in Maryland a police officer's observations regarding tint may serve as the basis for a lawful traffic stop. But, in that case, the court rejected the legality of the traffic stop because the officer executed the vehicle stop merely on the ground that the tinted window appeared darker than "'a normal window, . . . without tinting.'" *Id.* at 680, 934 A.2d at 41.

The *Williams* Court acknowledged that a tint meter is not required to effectuate a lawful stop. *Id.* at 691, 934 A.2d at 47. To the contrary, the *Williams* Court agreed that "an officer's observations may be the basis for such a stop . . . ." *Id.* However, the court reasoned that an officer's observations may support a stop on the basis of tinting only "if those observations truly suffice to give a reasonable articulable suspicion that one or more windows are not in compliance with the statutory and regulatory requirements." *Id.* The majority found deficient the fact that the

_____

[12] In Maryland's general election of November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved changing the name of the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved Constitutional Change Renames High Courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/K87C-UUCG.

However, I will refer to the Maryland courts by the names that were in effect when the cited cases were decided.

officer merely compared the tinted window to an untinted window and then characterized the tinted window as darker than "'normal.'"  *Id.*

In the view of the majority, a stop on that basis was not permissible under the Fourth Amendment, "for it would effectively strip away Fourth Amendment protection for any person driving or owning a car with tinted windows."  *Id.* at 692, 934 A.2d at 47.  According to the court, if an officer "chooses to stop a car for a tinting violation based solely on the officer's visual observation of the window, that observation has to be in the context of what a properly tinted window, compliant with the 35% requirement, would look like."  *Id.*  The court added:  "If the officer can credibly articulate that difference a court could find reasonable articulable suspicion . . . .[]"  *Id.*, 934 A.2d at 47-48.

*Turkes v. State*, 199 Md. App. 96, 20 A.3d 173 (2011), is also relevant.  As in this case, the officer in *Turkes* explained that, based on his training and experience, he should be able to see into the vehicle if the tint is legal.  The Maryland Court of Special Appeals concluded that the vehicle stop for a tint violation was lawful in light of the police officer's training and experience in recognizing legally tinted windows.  *Id.* at 116, 20 A.3d at 184.

The Fourth Circuit's ruling in *United States v. Walker-Bey*, 800 Fed. App'x 161 (4th Cir. 2020) (per curiam), is also pertinent.  There, the officer initiated a traffic stop because he believed the windows of the defendant's vehicle were darker than permitted by Maryland law.  *Id.* at 162.  He explained that, based on "his on-the-job training," if he cannot see inside the vehicle, it is "'likely . . . going to be too dark for the law.'"  *Id.* at 163.  The officer concluded, based on his observations, that the tint exceeded the legal limit.  The trial judge credited the officer's testimony.  *Id.*  And, the Fourth Circuit concluded that the trial court did not err in finding that the

officer articulated a reasonable suspicion that justified the vehicle stop.  As a result, it upheld the denial of the suppression motion.  *Id.*

Other courts have also upheld the legality of a traffic stop, finding probable cause, not just reasonable suspicion, based on the description of the window tinting when, as here, the officer could not see into the vehicle. *See, e.g., United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000); *United States v. Harrell*, 268 F.3d 141, 149 (2nd Cir. 2001); *State v. Wyatt*, 775 So. 2d 481, 483 (La. Ct. App. 2000); *State v. Taylor*, 683 N.E. 2d 367, 369-70 (Ohio 1996).

Detective Stewart did not use a tint meter.  Rather, he relied on his training and his experience in concluding that the tinting of the Acura was so dark that it did not comply with Maryland law.  He explained that a vehicle with lawful tinting would have enabled him to see inside the vehicle.  But, he could not do so.

As mentioned, Government's Exhibit 2 is a photo of the defendant's Acura.  ECF 79 at 33, 34.  It depicts the extent of the tint on the front windshield and the side windows of the vehicle.  In my view, the extent of the tinting seen in Government's Exhibit 2 appears consistent with Detective Stewart's description.

Detective Stewart testified at the hearing that, when tint is too dark, one would see his reflection in the window glass.  It is noteworthy that the officer's body camera video clearly shows the officer's reflection in the driver's side rear window, as if the officer were in front of a mirror. Government's Exhibit 1 at 1:44, 4:54.  And, as noted, the officer testified that if one can see his reflection in the tinted window, then the tinting is "over the limit."  ECF 79 at 19.

Moreover, Detective Stewart did not merely compare the vehicle to a "normal" car, as the officer had done in *Williams*, 401 Md. 676, 934 A.2d 38.  Rather, he provided a cogent explanation for his belief as to why the vehicle tint was too dark.  Significantly, his observations are borne out

by other evidence, such as the officer's reflection in the tinted windows of the Acura, as seen on the body camera footage.  In my view, based on Detective Stewart's training and experience, he had reasonable, articulable suspicion that the tint on the Acura did not comply with Maryland law. That determination does not end the inquiry, however.

The defendant contends that, regardless of the extent of the tint in issue, the stop was unlawful because the tint law applies only to vehicles registered in Maryland, and the Acura had a Pennsylvania dealer's tag.  In light of the Pennsylvania dealer's tag displayed on the Acura, Brandon insists that the officer had no basis to conclude that the defendant was operating a vehicle that was subject to Maryland law.

The case of *Baez v. State*, 238 Md. App. 587, 192 A.3d 945 (2018), is informative.[13] Indeed, the facts of *Baez* are similar to those of this case in many critical respects.

In *Baez*, the defendant appealed the denial of his motion to suppress evidence that was recovered following the stop of his vehicle for a window tint violation.  A search of the vehicle led to the recovery of marijuana, and U.S. currency was recovered from the defendant.  *Id.* at 592, 192 A.3d at 947.

The parties did not dispute that the vehicle tint violated Maryland law.  However, the vehicle was registered in Virginia.  *Id.* at 590, 591, 192 A.3d at 946, 947.  The defendant argued that, because the vehicle was registered in Virginia and not Maryland, Maryland's tint law did not apply to him or his vehicle, which meant that he could not have violated Trans. § 22-406.  *Id.* at 593, 192 A.3d at 948.  Therefore, according to the defendant, the stop was unlawful.  *Id.*

---

[13] The author of *Baez*, Judge Irma Raker, sat as a senior judge with the Maryland Court of Special Appeals.  However, from 1994 to 2008 she served on the Maryland Court of Appeals.

As the *Baez* Court explained, the Maryland General Assembly enacted legislation in 1995 to regulate on Maryland highways the operation of motor vehicles with tinted windows. *Id.* at 595, 192 A.3d at 949. Citing the Fourth Circuit's decision in *Stanfield*, 109 F.3d 976, the *Baez* Court noted that the "primary" purpose of the statute is the protection of the police officers, because when a law enforcement officer approaches a vehicle, it is imperative that the officer be able to see inside the vehicle. *Baez*, 238 Md. App. at 595-96, 192 A.3d at 949-50.

The *Baez* Court also explained that, "in order to avoid any conflict with the inter-state commerce provisions of the United States Constitution, the [Maryland] Legislature elected to avoid that possibility by limiting the application of the [tint] law to vehicles registered only in Maryland . . . ." *Baez*, 238 Md. App. at 596, 192 A.3d at 950. Nonetheless, the *Baez* Court was clear that the out-of-state vehicle registration for the automobile in question did not render the stop unlawful. It said: "The stop by the officer was reasonable under the totality of the circumstances. The officer had a right to make an investigatory stop based on the tinted windows of appellant's vehicle. *That the vehicle was registered in Virginia did not preclude the police officer from stopping appellant's vehicle to investigate further and to ascertain where the vehicle was registered.*" *Id.* at 597, 192 A.3d at 950 (emphasis added).

As the *Baez* Court observed, a law enforcement officer merely needs reasonable suspicion to stop a vehicle to investigate. *Id.* Of import here, it said, *id.* at 598, 192 A.3d at 951 (emphasis added): "A police officer, suspecting a tint window violation, *may lawfully stop a vehicle to investigate further and ask to see the vehicle registration to determine origin of registration. That the vehicle may be registered in a foreign jurisdiction does not vitiate the lawfulness of the stop.*" In this regard, the court observed that the fundamental purpose of a *Terry* stop is to confirm or dispel suspicion by asking for an explanation of the suspicious behavior. *Id.*

Significantly, the legality of a traffic stop initiated by a state law enforcement officer is determined by state law, unless the state law violates the federal Constitution. *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *Ker v. California*, 374 U.S. 23, 37 (1963).   Moreover, a reported opinion of the Maryland Court of Special Appeals constitutes binding precedent in Maryland. *See Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 325, 933 A.2d 405, 424 (2007).   In short, under *Baez*, Detective Stewart's actions were clearly authorized by Maryland law, notwithstanding the Pennsylvania dealer's tag on the Acura.

However, Brandon argues otherwise, citing the case of *United States v. Frank Johnson*, 256 F.3d 214 (4th Cir. 2001).[14]   In that case, the defendant, a Georgia resident, was driving in South Carolina with a Georgia license plate on his vehicle. *Id.* at 215.   A South Carolina trooper stopped the vehicle based on his belief that the vehicle did not comply with South Carolina's window tinting law. *Id.*   Canine alerted to the trunk and the officer recovered approximately two kilograms of cocaine from the vehicle. *Id.* at 215-16.   On appeal, the Court considered whether the vehicle stop violated the defendant's rights under the Fourth Amendment. *Id.* at 216.

The Court observed that the police officer had stopped the defendant based on the belief that the vehicle the defendant was driving did not comply with South Carolina law.   That law provided, in part, that a person may not operate a motor vehicle "required to be registered in [South Carolina] on any public highway, road, or street that has a sunscreen device on the windshield . . . ." *Id.* (citing S.C. Code Ann. § 56-5-5015(A)).   However, the defendant maintained that the stop was illegal because the law applied only to a vehicle required to be registered in South

---

[14] Judge J. Michael Luttig authored the opinions in both *Stanfield* and *Johnson*.   Given that *Baez* was decided in 2018, and the *Baez* Court cited *Stanfield*, it is reasonable to assume that the *Baez* Court was also aware of *Johnson* but did not regard *Johnson* as controlling.

Carolina and, in the defendant's view, the officer had no basis to conclude that the vehicle was required to be registered in South Carolina. *Id.* The Fourth Circuit agreed. *Id.*

To be sure, the vehicle was clearly being operated on a public highway. And, it was undisputed that the officer had reasonable suspicion to believe that the tint did not meet the requirements of South Carolina law, because it was so dark that the officer could not see into the car. *Id.* However, the tint law applied only to vehicles that were required to be registered and licensed in South Carolina and not to nonresidents. *Id.* Specifically, registration in South Carolina was required in one of two circumstances: establishment of domicile or operation of the vehicle in the State for more than 150 days. *Id.* at 217.

On the basis of these facts, the Fourth Circuit said, *id.*: "The mere display of a license plate from another state is not relevant at all as to whether [the defendant] had established a domicile in South Carolina or had been operating the vehicle in South Carolina for an accumulated period of greater than 150 days." The Court continued, *id.*: "Without reasonable suspicion to believe that Johnson's car was required to be registered in South Carolina, [the trooper] had no reasonable suspicion of unlawful conduct, because it is not unlawful under [South Carolina law] for a vehicle traveling on a public highway to have a noncompliant sunscreen device unless the vehicle is also required to be registered in South Carolina.[]" Notably, the Court observed that the officer did not testify that he stopped the car "out of any concern that it was required to be registered in South Carolina." *Id.* n.2.

Two recent cases in this District have interpreted the Fourth Circuit's decision in *Johnson* and have reached opposing conclusions. I turn to review them.

The defendant relies on *United States v. Brooks*, TDC-22-0428, 2023 WL 4157341 (D. Md. June 23, 2023). There, the defendant was charged with federal firearms and drug trafficking

offenses arising out of a search of his vehicle in June 2022.  The officer saw the defendant and his vehicle in an apartment complex parking lot and observed that the windows and windshield "were very darkly tinted, and that the vehicle did not have a front license plate."  *Id.* at *1.  As the defendant was exiting the vehicle, a traffic stop was effected, with multiple police officers on hand. No key was in the ignition.  *Id.* at 2.  Through the open driver's side door, an officer saw crack cocaine on the floorboard.  *Id.*  The officer also smelled marijuana.  *Id.*  A full search of the vehicle was conducted, and contraband was recovered.  The window tints were also tested and were found in violation of Maryland's window tint laws.  *Id.* Only after the stop was initiated did officers observe a temporary Georgia license plate on the back of the vehicle.  *Id.*

Judge Chuang noted that the law enforcement officer "immediately recognized that the window tinting was particularly dark."  *Id.* at *5.  He determined that the law enforcement officer "correctly judged that the window tints on the Accord were sufficiently dark that they would violate the limits set by Maryland law for Maryland-registered vehicles."  *Id.* at *6.  Nevertheless, Jude Chuang said, *id.*:  "The darkness of the windows . . . did not necessarily justify a traffic stop for two reasons."  *Id.*  He explained, *id.*:  "First, under the plain language of the statute, the window tint law applies only to the operation of a vehicle on a 'highway' in Maryland."  Moreover, he stated that the private parking lot of an apartment building, where the vehicle was located, did not qualify as a highway.  *Id.*  Further, he said that "an officer must 'observe' that the vehicle is being operated on a highway in violation of the law in order to have authorization to stop that vehicle." *Id.*  But, the driver was not "operating the vehicle at all, much less on a highway."  *Id.*  And, of significance here, Judge Chuang concluded that, even if the lack of operation of the vehicle did not preclude a traffic stop, "the stop was also flawed because the window tint law applies only to vehicles registered in the state of Maryland."  *Id.* at *7.

Pursuant to the Fourth Circuit's decision in *Johnson*, 256 F.3d 214, Judge Chuang concluded in *Brooks*, 2023 WL 4157341, at *7: "A law enforcement officer must have reasonable suspicion to believe that a vehicle is required to be registered in Maryland in order to have reasonable suspicion to stop that vehicle for a violation of the Maryland window tint law." *Id.* In Judge Chuang's view, "the officers had no reason to believe that [the defendant's] vehicle was registered in Maryland or required to be registered in Maryland." *Id.* And, he pointed out that "the officers had the opportunity to check the license plate before conducting the stop" but failed to do so. *Id.* at *8.

Judge Chuang recognized that *Johnson* and *Baez* "provide conflicting and contradictory holdings on the same question: whether an officer may stop a vehicle for a violation of window tint laws applicable only to in-state vehicles without a reasonable suspicion that the vehicle is registered or required to be registered in that state." *Id.* at *8. In his view, the decisions were not "reconcilable" and he was bound by the Fourth Circuit's decision in *Johnson*. *Id.* Based on *Johnson*, he concluded that the officers lacked reasonable suspicion to justify the traffic stop based on the window tint, "because they had no facts supporting a reasonable suspicion that the vehicle was or was required to be registered in Maryland." *Id.*

In addition, Judge Chuang declined to apply the good faith exception to the exclusionary rule, announced in *United States v. Leon*, 468 U.S. 897, 920-21 (1984). *See Brooks*, 2023 WL 4157341, at *9-10. I discuss good faith, *infra*.

The government relies on Judge Grimm's decision in *United States v. Davonta Johnson*, PWG-21-171, 2021 WL 5882570 (D. Md. Dec. 13, 2021).[15] In that case, a local law enforcement

---

[15] To distinguish the Fourth Circuit's *Johnson* case from Judge Grimm's *Johnson* case, I sometimes use the first names of the defendants in those cases.

officer initiated the stop of the defendant's automobile "because of the extreme darkness of the tinting on its windows, which [the officer] reasonably suspected was darker than that allowed by" Trans. § 22-406(i).  *Id.* at *1.  Prior to the stop, the officer had asked a colleague to check the registration of the vehicle, which displayed a temporary Virginia license plate.  *Id.*  But, the results of the inquiry were not available until after the defendant was arrested.

Of pertinence here, Judge Grimm rejected the contention that the Maryland intermediate appellate court's decision in *Baez* "articulates a legal position that explicitly was rejected by the Fourth Circuit" in *Johnson*.  *Id.*  He reasoned that the Fourth Circuit's *Frank Johnson* decision "focused on whether the officer had a reasonable suspicion that the automobile was required to be registered in South Carolina, which depended on whether the driver was domiciled in South Carolina or had operated the vehicle in that State for more than 150 days—facts that could not be determined just by observing the vehicle driving on a South Carolina highway.  *Id.* (citing *Johnson*, 256 F.3d at 216-17).  In contrast, Judge Grimm recognized that "the display of a temporary out-of-state license on a vehicle is relevant to whether that vehicle in fact is validly licensed in the out-of-state jurisdiction, as the [Maryland] Court of Special Appeals discussed in *Baez*."  *Johnson*, 2021 WL 5882570, at *1.  Alternatively, Judge Grimm concluded that the officer "acted in objectively reasonable reliance on binding Maryland judicial precedent," and therefore "application of the exclusionary rule" was unwarranted.  *Id.* at *2.

Here, as noted, Detective Stewart testified that he ran the defendant's vehicle tag prior to making contact with him.  ECF 79 at 37.  Although the tag was owned by a dealership, *id.* at 38, no registration record was found for the car.  *Id.* at 37-38.  In the officer's view, the dealer tag seemed "out of place," because the vehicle was not in a condition to be sold, due to the extent of the tint.  *Id.* at 35.

As I see it, Detective Stewart's unsuccessful attempt to ascertain the Acura's state of registration before he initiated the traffic stop is a critical factual distinction from the Fourth Circuit's *Johnson* case.   *See* Government's Exhibit 4; ECF 79 at 38-39.  As discussed at length, the purpose of a *Terry* stop is to investigate possible criminal activity or dispel suspicion.  In contrast to this case, the officer in the *Frank Johnson* case had no basis to suspect that the vehicle with a Georgia tag was actually registered in South Carolina, and therefore subject to South Carolina law; he did not attempt to verify the place of registration before stopping the vehicle.  But, in this case, Stewart sought to determine the place of registration, without success.  And, recent Maryland law has expressly upheld the stop of a vehicle with a tint violation, notwithstanding an out-of-state license plate, in order to permit an officer to  investigate and verify the place of registration.

Even assuming, *arguendo*, that the traffic stop was illegal, suppression is not necessarily warranted.  "Whether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question [of] whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).  Therefore, I next consider whether the good faith exception to the exclusionary rule applies here, even if, *arguendo*, the stop was unlawful.

### C.  Good Faith

When a seizure violates the Fourth Amendment, "evidence obtained in violation of the Fourth Amendment" may be inadmissible under the exclusionary rule, which is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974); *see United States v. Kimble*, 855

F.3d 604, 610 (4th Cir. 2017); *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014). The exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *United States v. McLamb*, 880 F.3d 685, 690 (4th Cir. 2018).

In *United States v. Leon*, 468 U.S. 897 (1984), and the companion case of *Massachusetts v. Sheppard*, 468 U.S. 981 (1984), the Supreme Court recognized a good faith exception to the exclusionary rule. The Court in *Leon* considered whether "suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" was justified. *Id*. at 922. In establishing the good faith exception to the exclusionary rule, *Leon* provided for the admissibility of evidence seized pursuant to a warrant subsequently determined to be invalid, if the "officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Leon,* 468 U.S. at 922. The *Leon* Court concluded that a police officer's reliance on an invalid search warrant was not subject to suppression, because reliance on a judicially authorized warrant was objectively reasonable. *Id.* at 922-23. Accordingly, when investigators "act with an objectively 'reasonable good-faith belief' that their conduct is lawful," the exclusionary rule will not apply. *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *Leon*, 468 U.S. at 909).

The exclusionary rule is a "'prudential' doctrine," fashioned "to 'compel respect for the constitutional guaranty.'" *Davis*, 564 U.S. at 236 (citations omitted). It "is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)); *see Leon*, 468 U.S. at 906. Rather, its purpose is to "deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236-37; *see United States v. Edwards*, 666 F.3d 877, 886 (4th Cir. 2011).

Notably, "[e]xclusion exacts a heavy toll on both the judicial system and society at large," because "[i]t almost always requires courts to ignore reliable, trustworthy evidence." *Davis*, 564 U.S. at 237. Therefore, the "'unbending application'" of the exclusionary rule "'would impede unacceptably the truth-finding functions of judge and jury,'" and "'generat[e] disrespect for the law and administration of justice.'" *Leon*, 468 U.S. at 907-08 (citations omitted). As a result, the mere fact of a Fourth Amendment violation does not always require exclusion. *Herring v. United States*, 555 U.S. 135, 140 (2009); *Stephens*, 764 F.3d at 335.

The cost of exclusion is particularly high—and often disproportionate to exclusion's deterrent effect—"when law enforcement officers have acted in objective good faith or their transgressions have been minor." *Leon*, 468 U.S. at 908. Therefore, "[e]xclusion of evidence only is appropriate if the deterrence benefits of suppression outweighs [sic] the heavy societal costs of exclusion." *United States v. Wilks*, 647 F.3d 520, 523 (4th Cir. 2011); *see Davis*, 564 U.S. at 237; *Herring*, 555 U.S. at 145; *United States v. Fall*, 955 F.3d 363, 371 (4th Cir. 2020); *United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018); *United States v. Thomas*, 908 F.3d 68, 73 (4th Cir. 2018); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *United States v. Doyle,* 650 F.3d 460, 467 (4th Cir. 2011); *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004).

*Leon* teaches that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances." 468 U.S. at 922 n.23; *see also Stephens*, 764 F.3d at 335; *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011). In other words, suppression is not appropriate when "the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015). But, "good faith

does not mandate best practices." *United States v. Aigbekaen*, 943 F.3d 713, 725 (4th Cir. 2019). Moreover, the exclusionary rule is not a "strict-liability regime." *Davis*, 564 U.S. at 240.

Indeed, exclusion is a "'last resort'". *Davis*, 564 U.S. at 2371 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Instead, the exclusionary rule calls for a "balancing approach," which entails weighing the deterrent effect of suppression against the costs of exclusion, on a case-by-case basis. *Leon*, 468 U.S. at 913-24.

The "good faith" exception carries equal force when law enforcement agents act in reasonable reliance on judicial decisions authorizing their conduct. *Davis*, 564 U.S. 229. The same reasoning applies when law enforcement agents act in accordance with a state statute. *See Illinois v. Krull*, 480 U.S. 340, 356-60 (1987) (holding that exclusionary rule did not apply to evidence obtained by officers acting in reliance on state statute authorizing warrantless administrative search, where statute was subsequently found to violate the Fourth Amendment and search was deemed unconstitutional).

A reasonably well-trained officer is required to know "well-established current law." *United States v. Hale*, 784 F.2d 1465, 1470 (9th Cir. 1986), *abrogated on other grounds by United States v. Weber*, 923 F.2d 1338 (9th Cir. 1990). Similarly, a reasonably well-trained officer would be aware of relevant court decisions. *See United States v. Savoca*, 761 F.2d 292, 297 (6th Cir.), *cert. denied*, 474 U.S. 852 (1985).

In *Davis*, 564 U.S. 229, the Supreme Court considered the legality of a search that violated the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009), but occurred two years before *Gant* was decided. In *Gant*, the Court held that a warrantless vehicle search incident to lawful arrest is not valid if it occurs after the defendant is arrested, handcuffed, and placed in the back of a patrol car. *See id.* at 335. In so holding, the Court departed from the decision in *New*

*York v. Belton*, 453 U.S. 454 (1981), which "was widely understood to have set down a simple, bright-line rule" authorizing warrantless "automobile searches incident to arrests of recent occupants, regardless of whether the arrestee . . . was within reaching distance of the vehicle at the time of the search." *Davis*, 564 U.S. at 233 (citing *Thornton v. United States*, 541 U.S. 615, 628 (2004) (Scalia, J., concurring)).

At the time of the search at issue in *Davis*, the search complied with appellate precedent in the Eleventh Circuit, which had "long read *Belton* to establish [such] a bright-line rule." *Davis*, 564 U.S. at 235 (citing *United States v. Gonzalez*, 71 F.3d 819, 822, 824-827 (11th Cir. 1996)). The *Davis* Court held, 564 U.S. at 239-40, that when law enforcement agents conduct a search in objectively reasonable reliance on binding judicial precedent, "police culpability" is wholly absent. It reasoned, *id.* at 240:

> The officers who conducted the search did not violate Davis' Fourth Amendment rights deliberately, recklessly, or with gross negligence. . . . Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

The Court continued, *id.* at 241: "[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime- detection and public-safety responsibilities." (Emphasis in original). In the Court's view, "all that exclusion would deter in this case is conscientious police work." *Id.*; *see also Krull*, 480 U.S. at 350 ("If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.").

*Wilks*, 647 F.3d 520, also provides guidance. There, the Fourth Circuit considered "whether the good-faith exception to the exclusionary rule permits the admission of evidence obtained by a police officer who conducts a search in objectively reasonable reliance on binding appellate . . . precedent that is later overruled." *Id.* at 521.   At the time of the vehicle search in issue, it comported with then-binding Fourth Circuit precedent that was later overruled by *Arizona v. Gant*, 556 U.S. 332. *See Wilks*, 647 F.3d at 521-22.

In particular, law enforcement officers searched the front seat of the vehicle after handcuffing the defendant and placing him in the back seat of the patrol car. *Id.* at 521. The parties did not dispute that, under *United States v. Milton*, 52 F.3d 78, 80 (4th Cir. 1995), the search of the vehicle "was permissible at the time." *Wilks*, 647 F.3d at 522. Finding *Wilks* to be "on all fours" with *Davis*, the Fourth Circuit held that the exclusionary rule did not apply, so as to preclude the admission of evidence recovered during the search. *Id.* at 524.

In *Brooks*, 2023 WL 4157341, a tint case discussed earlier, Judge Chuang found the good faith doctrine inapplicable because appellate precedent was "conflicting and contradictory." *Id.* at *10.  Judge Chuang acknowledged that the exclusionary rule does not apply if, among other things, "'binding appellate precedent specifically authorizes' the 'particular police practice,' and the action was taken in 'reasonable reliance'" on such precedent.  *Id.* at *9.   However, in Judge Chuang's view, the good faith exception under *Davis* was inapplicable because the "binding appellate precedent was not uniform and instead was conflicting and contradictory."  *Id.* at *10 (citing *Aigbekaen*, 943 F.3d at 725; *United States v. Kolsuz*, 890 F.3d 133, 148 (4th Cir. 2018)).[16]

---

[16] In my view, the cases cited by Judge Chuang do not compel a rejection of the good faith doctrine here.

*Aigbekaen*, 943 F.3d 713, involved the applicability of a border search exception to the warrant requirement for electronic devices.  And, the Court concluded that the good faith doctrine applied.  *Id.* at 725.  *Kolsuz*, too, involved the border search exception to the warrant requirement.

In addition, notwithstanding that the police officers in *Brooks* were not federal agents, Judge Chuang rejected the government's contention that they should be held only to binding Maryland appellate precedent.  *Id.*  Given the frequency with which the government prosecutes in federal court cases investigated by local police departments, he declined to conclude that the local police officers "need not consider or follow the binding precedent of the Fourth Circuit."  *Id.* Therefore, Judge Chuang held that the good faith exception was inapplicable.  *Id.*

In contrast, Judge Grimm concluded in *Davonta Johnson*, 2021 WL 5882570, another tint violation case discussed above, that the police had the right to rely on the decision of the Maryland Court of Special Appeals in *Baez*, 238 Md. App. at 497, 192 A.2d at 95.  In his view, *Baez* constituted "binding authority" and was controlling as to Maryland law.  *Id.* at *1.

Detective Stewart acted pursuant to a Maryland statute as well as binding Maryland judicial precedent interpreting the statute.  The Fourth Circuit's decision in *Frank Johnson* concerned a South Carolina statute.  As Judge Grimm explained in the *Davonta Johnson* case, 2021 WL 5882570, the decision of the Maryland Court of Special Appeals in *Baez* is factually distinguishable from the Fourth Circuit's *Frank Johnson* decision.  *See Baez*, 238 Md. App. 587, 192 A.3d 945.  Under *Baez*, decided seventeen years after the Fourth Circuit's decision in *Frank Johnson*, 256 F.3d 214, Maryland law permits a police officer who suspects a window tint violation to stop a vehicle with an out-of-state license to investigate where the vehicle is registered, without vitiating "the lawfulness of the stop."  *Baez*, 238 Md. App. at 497, 192 A.3d at 950.

---

The Court concluded, *inter alia*, that the good faith doctrine applied because the officers who conducted a forensic analysis of the defendant's phone were entitled "to rely on the established and uniform body of precedent allowing warrantless border searches of digital devices that are based on at least reasonable suspicion."  *Id.* at 148.

In my view, the officer acted in objectively reasonable reliance on Maryland statutory law and binding Maryland judicial precedent. To invoke the sanction of exclusion here would fly in the face of *Davis*, 564 U.S. at 239-41, because of the absence of culpability by the police officer.

### D. The Opening of the Car Door

Brandon contends that Detective Stewart illegally searched the Acura when he opened the driver's side door, without defendant's consent, and without legal justification, to retrieve the VIN from the doorjamb. ECF 28 at 1, 3, 9-10; ECF 43 at 21.

The government argues that the opening of the car door was a safety measure, not an intrusive search that violated the Fourth Amendment. ECF 32 at 10. According to the government, because the defendant lacked proof of registration, the officer was entitled to verify the registration though the VIN. *Id.*

*New York v. Class*, 475 U.S. 106 (1986), provides guidance. In that case, the defendant was stopped for a traffic violation and exited his car. *Id.* at 107. At the time, the VIN was generally visible from outside the vehicle, and also located on the driver's side doorjamb and the interior dashboard. *Id.* at 107-08. The officer opened the car door but he could not find the VIN on the doorjamb, and papers blocked the dashboard. *Id.* at 108, 111. So, the police officer reached into the passenger compartment and moved papers that were obscuring his view of the VIN. *Id.* at 108. At that time, he saw the handle of a gun. *Id.* at 108, 114. The Supreme Court held that the officer's entry into the car did not violate the Fourth Amendment. *Id.* at 107, 119.

The Court explained that a VIN "is roughly analogous to a serial number" and is "a significant thread in the web of regulation of the automobile." *Id.* at 111. Indeed, it "plays an important part in the pervasive regulation by the government of the automobile." *Id.* at 113.

Moreover, it must be "placed in the plain view of someone *outside* the automobile" under federal law. *Id.* at 111 (emphasis in *Class*); *see id.* at 112.

In the view of the Court, "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Id.* at 114. As the Court put it, "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *Id.* The Court also said, *id.*: "In sum, because of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view, we hold that there was no reasonable expectation of privacy in the VIN." And, the Court made clear that any effort to restrict access, such as with the papers, does "not generate a reasonable expectation of privacy where none would otherwise exist." *Id.*

Moreover, the Court had "no difficulty in concluding that a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop." *Id.* at 115. Given the danger to the officer's safety in conducting a car stop, the Court concluded that the officer did not have to return the defendant to his vehicle in order to obtain the VIN. *Id.* at 116. Instead, the officer could "move the papers himself." *Id.* at 118. Because the officer "did not root about the interior" of the vehicle to examine the VIN, *id.*, the Court determined that the "search was sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN . . . ." *Id.* at 119.

Of import, however, the Court also said, *id.*: "[O]ur holding today does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile." The Court added, *id.*: "If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see

47

it." *Id.*; *see also United States v. Jones*, 565 U.S. 400, 410 (2012) (reiterating that in *Class*, the Court "concluded that an officer's momentary reaching into the interior of a vehicle did not constitute a search[l]").

In this case, Detective Stewart never entered the passenger compartment to locate the VIN. Unlike the officer in *Class*, he located the VIN on the doorjamb, not the dashboard.  And, in any event, unlike in *Class*, no evidence was obtained from the interior of the vehicle as a result of Detective Stewart's brief opening of the car door.

At the hearing, Detective Stewart explained that the VIN can be found on the front windshield of an automobile, among other places.  ECF 79 at 41, 98.  But, he stated that, for safety reasons, he did not want to step in front of the vehicle.  *Id.*  So, he opened the car door and used his cellphone to photograph the VIN, while the defendant remained in the car.  The officer never looked into the interior of the vehicle.

On cross-examination, the defense elicited that Detective Stewart told IAD, which was investigating his use of force, that he could not see the VIN through the tint, and that is why he opened the car door to obtain the VIN.  *Id.* at 98-99; *see also id.* at 183-84.  The officer explained, *id.* at 99:  "I gave a direct statement towards the fact of the windshield was completely tinted all the way down, so I wasn't going to put myself at risk by even trying to venture to that part of the vehicle to take a look . . . ."

In my view, the officer testified credibly as to his recollection.  The statements are not necessarily inconsistent.  And, even if the VIN on the windshield was visible,[17] it is difficult to fault the officer for deciding not to step in front of the car while the driver was in the driver's seat.

---

[17] Defense counsel argued that the VIN was visible, "plain as day," on the windshield.  *Id.* at 184.  But, seeing the VIN and reading it are not coextensive.

Moreover, this was not a situation where the officer entered the passenger compartment of the vehicle to locate the VIN; he confined his search to the doorjamb.

Therefore, I conclude that Detective Stewart did not violate the Fourth Amendment when he opened the driver's car door to locate the VIN.

### E.  The Pat Down

Defendant contends that Detective Stewart made a "baseless decision" to conduct a frisk of the defendant when he exited his car at the instruction of the officer.  ECF 28 at 12.  According to Brandon, the officer lacked any suspicion that he was armed and dangerous.  *Id.* at 13-14; ECF 79 at 174.  And, according to defendant, the illegal search led to the recovery of contraband that must be suppressed.  ECF 28 at 12; *see also* ECF 43 at 21.

Further, the defense maintains that because the pat down was illegal from its inception, the defendant's conduct in attempting to flee does not constitute an intervening event that purges the taint of the illegal police conduct.  ECF 79 at 143.  Moreover, the defense disputes that, among other things, the officer saw a bulge that looked like a gun.

As discussed, the defendant had no driver's license, and therefore he was not permitted to drive the car.  *See* Trans. § 16-101(a)(1).  A person who drives a car without a valid license is subject to arrest.  Trans. § 26-202(3)(viii).  And, a conviction for driving without a license in Maryland is punishable by incarceration.  *See* Trans. § 16-101(c).  However, Detective Stewart did not intend to arrest the defendant for this offense.[18]

---

[18] The defense acknowledged that the officer could have arrested the defendant for driving without a license.  ECF 79 at 164, 166.

The government initially argued that Officer Stewart executed a lawful arrest and conducted a search incident to arrest. ECF 32 at 11. But, it abandoned that argument at the hearing. ECF 79 at 14, 139.[19]

Instead, the government argues that the pat down of the defendant was supported by reasonable, articulable suspicion. In particular, the government contends that the officer conducted a lawful frisk of the defendant because, upon exiting the vehicle, the defendant displayed "armed characteristics . . . ." ECF 79 at 139.

In this regard, Detective Stewart testified that, when the defendant exited the vehicle, he saw "a bulge of the shape and size of what [he] believed to be a handgun . . . ." ECF 79 at 43; *see also id.* at 44-45. The officer also described the bulge as "L-shaped." *Id.* at 109. In addition, Detective Stewart recalled that when the defendant "stepped out of the vehicle," he did so at "a normal pace" with his left leg but at "a slower pace" with his right leg. *Id.* at 43. And, Detective Stewart claimed that the defendant "turned his body away from" the officer, "pointing himself into the angle between the driver's side door and the frame of the body of the vehicle," in a maneuver

---

[19] "It is irrelevant that because probable cause existed, there could have been an arrest . . . . A search must be incident to an actual arrest, not just to probable cause that might have led to an arrest, but did not." *People v. Reid*, 24 N.Y. 3d 615, 618, 26 N.E. 3d 237, 238 (2014) (emphasis in *Reid*); *see Knowles v. Iowa*, 525 U.S. 113 (1998); *see, e.g., Sinclair v. State*, 2022 WL 94613, at *8 (Md. Ct. Spec. App. Jan. 10, 2022) ("[T]he search of Appellant cannot be justified as a search incident to arrest where the intent to arrest Appellant did not arise until after discovering a firearm on Appellant's person."); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 649 n.651 (S.D.N.Y. 2013) (declining to hold "that a search can be justified as incident to arrest where the officer has no *intention* of arresting the individual at the time the search is conducted" (emphasis in original)); *State v. Smith*, 155 N.J. 83, 92, 713 A.2d 1033. 1038 (1998) ("[T]he police must have contemporaneous subjective intent to arrest in order to justify a search incident to arrest."); *State v. Taylor*, 167 Ariz. 439, 439 (Ct. App. 1990) ("The issue raised by these facts is whether officers are free to search anyone they might arrest but have no intention of arresting under a search incident to arrest theory. We believe they may not.").

known as "blading." *Id.* As noted, the maneuver is evident in the officer's body worn video. *See* Government's Exhibit 1 at 5:00.

On the date of the occurrence, Detective Burke prepared three reports: the Application for Charges; the Statement of Probable Cause; and the Incident Report. *See* Defendant's Exhibits 4, 5, 6. The reports do not mention that Detective Stewart claimed to have seen a bulge in the defendant's pants, consistent with the shape of a gun. But, Stewart did not participate in the drafting of any of the reports, nor did he review them prior to their submission. *See*, *e.g.*, ECF 79 at 80-1, 106-07.

Moreover, the government contends that the gun was not seized until after the crash. *Id.* at 137. According to the government, the pat down "never resulted in the recovery of any evidence" because the defendant "did an intervening illegal act by driving away" and "crashing" the vehicle. *Id.* at 139. In addition, the government contends that the weapon was lawfully recovered incident to the defendant's arrest. *Id.* at 201. And, it maintains that the contraband in the Acura was lawfully seized because it was in plain view in the car. *Id.* at 138. Alternatively, the government contends that the police were required to perform an inventory search of the vehicle because, at that point it had to be towed, and thus the items in the car inevitably would have been discovered. *Id.* at 138, 139.

I have already discussed, at length, principles of Fourth Amendment law in connection with the traffic stop. I incorporate that discussion here with regard to the pat down, and amplify it, as necessary.

For purposes of the Fourth Amendment, a seizure occurs "when the officer, 'by means of physical force or show of authority,' terminates or restrains [the suspect's] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations and some quotation marks omitted).

In *Torres v. Madrid*, ___ U.S. ___, 141 S. Ct. 989, 995 (2021), the Supreme Court said: "The application of physical force to the body of a person with intent to restrain is a seizure . . . ." The *Torres* Court cited *California v. Hodari D.*, 499 U.S. 621, 624 (1991), for the proposition that an arrest is the application of physical force with the intent to restrain. *See Torres*, 141 S. Ct. at 995; *see also Cloud*, 994 F.3d at 241.

To conduct a lawful frisk during a traffic stop, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. at 327. The standard for conducting a lawful frisk requires both (1) a valid investigatory stop and (2) a reasonable suspicion that the person stopped is armed and dangerous. *Curry*, 965 F.3d at 320; *see also Arizona v. Johnson*, 555 U.S. at 326-27; *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc); *George*, 732 F.3d at 299-302; *Powell*, 666 F.3d at 187-89.

But, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. And, in determining whether a frisk was justified, the court considers the "totality of the circumstances." *See Arvizu*, 534 U.S. at 273; *George*, 732 F.3d at 299; *United States v. Hernandez-Mendez*, 626 F.3d 203, 211 (4th Cir. 2010), *cert. denied*, 503 U.S. 926 (2011).

Detective Stewart testified that he saw a bulge in the defendant's pants, in the shape of a gun. The government also points to the officer's testimony that, when the defendant was asked to step out of the car, he exhibited the characteristics of an armed person. This included what Detective Stewart referred to as blading, *i.e.*, turning or twisting his body away from the officer, so as to avoid the officer; the defendant's manner in exiting the vehicle, with one leg moving

slower than the other; and the defendant "stiff armed his right arm down in front of him."  ECF 79 at 103.

The defense makes much of the fact that, at the relevant time, Stewart never reported that he saw a bulge.  The defendant advances numerous grounds to undermine the veracity of Detective Stewart's factual assertions.

I agree that, on the day in question, there is no indication that Detective Stewart reported that, when the defendant exited the Acura, he saw a bulge on the defendant that resembled a gun. And, as noted, Detective Burke's reports do not mention the bulge.  But, as indicated, the reports were not prepared by Detective Stewart or reviewed by him.

Immediately after the incident, Detective Stewart spoke with the OIC and recounted some of what occurred.  He did not mention that he saw a bulge in the shape of a gun.  Then, in the ambulance, Detective Stewart was questioned briefly by Detective Burke.  She activated her body worn camera for the interview.  *See* Defendant's Exhibit 11.  Again, Stewart did not indicate that he saw a bulge on the defendant that was shaped like a gun.  However, and of critical import, Burke's body camera video reveals that Detective Stewart began to tell Detective Burke about the initiation of the traffic stop, but he did not continue, saying words to the effect: "You don't care about that part."  *Id.* at 12:50.  Stewart largely confined his recitation to the struggle with the defendant and the crashes.

Clearly, Detective Stewart was not attempting to provide a complete account of what transpired when he spoke to the OIC or to Detective Burke.  In particular, he did not explain why he stopped the car or why he attempted to conduct a pat down.  Instead, the primary focus concerned the struggle for the gun and defendant's operation of the vehicle.

It is difficult to overlook that Detective Stewart had just been through a harrowing and life-threatening experience.  Significantly, the bulge was not the only detail that Stewart failed to mention on the date of the incident.  For example, at the scene, when talking to the OIC, and in the ambulance, when speaking with Detective Burke, Detective Stewart did not explain that he stopped the defendant because of a tint violation.  Although he began to provide Burke with some detail regarding the initiation of the traffic stop, he then decided she would not "care."

More than a year after the incident, on July 20, 2023, Detective Stewart was interviewed by IAD.  At that time, he did report, *inter alia*, that when the defendant exited the vehicle, he saw "an L Shape on Mr. Brandon's right leg."  *See* Defense Exhibit 8 at 7.  He also asserted that the defendant "bladed his body away" from Stewart and "stiff armed to the right."  *Id.*  Moreover, he recalled that the defendant's left leg was "moving 'at normal speed'" but he exited "slowly" from the vehicle.  *Id.*

I conclude that the officer was credible in his testimony as to his recollection of a bulge.  From my review of the video, the defendant was wearing close-fitting pants.  Moreover, the magazine of the gun was long, and extended well past the end of the firearm.  *See* Government's Exhibit 8.  The gun was also unholstered.  It is hard to conceive how a well-trained officer would have failed to notice an unholstered weapon of that size in the defendant's tight pants.  And, it is understandable that, at the scene, the defendant omitted details that, in hindsight, are important.[20]

On the basis of the bulge, the officer clearly had grounds for a pat down of defendant.  What the Fourth Circuit said in *United States v. Baker*, 78 F.3d 135, 137 (4th Cir. 1996), is apt:

---

[20] It is clear that Stewart does not concede wrongdoing as to his use of force in the vehicle.  He did not regard his placement of his hand on the defendant's neck as a chokehold.  Under all the circumstances, Stewart's unwillingness to admit that he used a chokehold does not cause me to discredit his testimony concerning the bulge.

"Based on the inordinate risk of danger to law enforcement officers during traffic stops, observing a bulge that could be made by a weapon in a suspect's clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped only for a minor violation." *See United States v. Black*, 525 F.3d 359, 365 (4th Cir. 2008) (concluding the detective had reasonable suspicion to conduct a *Terry* stop based on factors that included observation of a "bulge which was '6 to 8 inches long along the bottom of the pocket,' '1 to 1 ½ inches high,' and 'appeared to have a flat side'", and that "the encounter occurred in a high-crime area"); *see also United States v. Glover*, 662 F.3d 694, 698-700 (4th Cir. 2011).

Even in the absence of the bulge, however, I am satisfied that the officer had reasonable, articulable suspicion to conduct the pat down. The reasonable suspicion standard is not onerous. As discussed, an officer conducting a *Terry* stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Terry*, 392 U.S. at 27; *see also Alabama v. White*, 496 U.S. 325, 329-30 (1990); *United States v. Howell*, 71 F.4th 195, 200 (4th Cir. 2023); *Feliciana*, 974 F.3d at 523; *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013); *Ortiz*, 669 F.3d at 444. But, in assessing reasonable suspicion, officers must be permitted to make "'commonsense judgments and inferences about human behavior.'" *Glover*, 140 S. Ct. at 1188 (citation omitted); *see Navarette*, 572 U.S. at 404; *Sowards*, 690 F.3d at 587-88; *Johnson*, 599 F.3d at 343; *Perkins*, 363 F.3d at 321; *see also Branch*, 537 F.3d at 336-37 ("Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement.").

To be sure, the Fourth Circuit has warned against using "whatever facts are present, no matter how innocent, as indicia of suspicious activity." *United States v. Foster*, 634 F.3d 243, 248

(2011). Moreover, the Fourth Circuit has instructed that "[b]eing a felon in possession of a firearm is not the default status." *Black*, 707 F.3d at 540. In Maryland, which allows certain people to carry firearms, "the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." *Id.*

Nevertheless, Brandon's presence in a high-crime area where a stop is performed may be a relevant consideration in the *Terry* analysis. *See, e.g.*, *Wardlow*, 528 U.S. at 124; *Black*, 525 F.3d at 365. The stop here occurred in such an area, according to Stewart. Standing alone, this fact is not enough to support reasonable, particularized suspicion. *Wardlow*, 528 U.S. at 124; *Bumpers*, 705 F.3d at 171-72. But, it need not be ignored. In any event, that was not the stated basis for the pat down.

"A suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon." *George*, 732 F.3d at 299. Moreover, "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." *Id.* at 300. So, "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation." *McCoy*, 513 F.3d at 413-14 (citing *Arvizu*, 534 U.S. at 277-78). In other words, the court must evaluate "cumulative information" available to the detaining officer. *United States v. McBride*, 676 F.3d 385, 392 (4th Cir. 2012).

I have concluded that the stop itself was lawful under *Terry*, based on the officer's belief that the tint was illegal. The officer then learned that the defendant was operating a vehicle unlawfully because he had no driver's license. Therefore, Stewart asked the defendant to exit the vehicle. As the defendant exited the vehicle, Stewart said the defendant engaged in blading. And,

according to the officer, blading is a characteristic of an armed person.  The video supports the testimony as to blading.

Under the totality of the circumstances, I conclude that, even without the bulge, the officer had reasonable, articulable suspicion that the defendant was armed and dangerous.

### F.  Defendant's Intervening Conduct

The government contends that, even if the stop and/or the attempted pat down were unlawful, Brandon's intervening, illegal conduct vitiates the illegality and renders the gun and the contraband admissible.  The government relies on *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997).

Brandon counters that suppression is required because defendant's conduct does not vitiate the taint of illegality.  He relies on *United States v. Gaines*, 668 F.3d 170 (4th Cir. 2012).[21]  In my view, Brandon's illegal conduct constituted an intervening event that purged any taint.

The analysis begins with *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  There, the Supreme Court ruled that evidence that is the "fruit" of an illegal search or seizure must be suppressed.  *See also Brown v. Illinois*, 422 U.S. 590, 602 (1975).  The *Wong Sun* Court said, 371 U.S. at 487-88 (citation omitted):

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

Assuming that the traffic stop and/or the pat down were illegal, the question is whether "there is sufficient attenuation between the unlawful search and the acquisition of evidence" so as

---

[21] Judge Niemeyer sat on both cases.

to purge the taint of illegality. *Gaines*, 668 F.3d at 173. Several factors are pertinent to whether derivative evidence has been purged of the taint of unlawful police conduct. *Gaines*, 668 F.3d at 173. The factors include: 1) "the amount of time between the illegal action and the acquisition of the evidence;" 2) "the presence of intervening circumstances"; and 3) "the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown*, 422 U.S. at 603-04).

In *Sprinkle*, 106 F.3d 613, the defendant, a passenger in a vehicle, was subjected to a car stop. As the officer began a pat down of the defendant, he "'began to run.'" *Id.* at 616. He then pulled a handgun from his pants and, after a chase, fired a shot toward the officer. *Id.*

The Court concluded that the stop was not supported by reasonable, articulable suspicion.[22] Nevertheless, the government argued that, when the defendant drew the gun, he committed a new crime, distinct from the one for which he was stopped; the gun was in plain view, *id.* at 619; and it could be seized. *Id.* at 620. The Court unanimously concluded that the defendant's intervening illegal acts triggered an exception to the exclusionary rule. *Id.* at 619. It stated, *id.*: "If a suspect's response to an illegal stop 'is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime.'" (Citation and footnote omitted).

The Court explained, *id.*: "There is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest." Further, the Court reasoned: "'A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct.'" (Citation omitted). Thus, in finding the

---

[22] Judge Niemeyer disagreed with that conclusion. He was of the view that the traffic stop was supported by reasonable, articulable suspicion. Of note here, the panel majority, consisting of the late Judge Michael and Judge Motz, agreed that the defendant's behavior in trying to hide his face to conceal his identity was "suspicious," *id.* at 616, but not enough to tip the scale in favor of reasonable suspicion. *Id.*

exclusionary rule inapplicable, the Court said: "Because the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible." *Id.*

In *Gaines*, 668 F.3d 170, the defendant was a passenger in a vehicle that was subjected to a traffic stop because of a cracked windshield. *Id.* at 171. The officer ordered the defendant to exit the vehicle and then immediately began a pat down. As the officer reached the area of the defendant's waistband, the officer felt the handle of a firearm and immediately yelled "'gun.'" *Id.* at 171. The defendant then struck the officer in the face with his elbow. *Id.* As the defendant "turned to flee," the officer actually saw the firearm. *Id.* The defendant then punched the officer. *Id.* Thereafter, the defendant struggled with two officers, and the gun fell from the defendant's waistband. He was subdued, arrested, and the gun was seized. *Id.*

The district court suppressed the gun as fruit of the poisonous tree. *Id.* at 172. In a two-to-one decision, the Fourth Circuit affirmed. *Id.* at 176.

On appeal, the government conceded that both the traffic stop and the pat down were unlawful. *Id.* at 172. But, the government argued that the defendant's assault of the officers purged the taint and therefore the gun was admissible in evidence. *Id.* In its view, because the gun had not been seized prior to the assault, "it could later be lawfully seized pursuant to a valid arrest for the assault . . . ." *Id.* at 173. In other words, the government claimed that "the assault broke the chain of causation resulting from the illegal stop." *Id.*

However, the Court concluded that the defendant's "commission of a crime *after* discovery of the gun by police, but *before* its seizure" is not an intervening circumstance sufficient to purge the taint. *Gaines*, 668 F.3d at 173 (emphasis in *Gaines*). In reaching its conclusion, the Court distinguished *Sprinkle*, noting that in that case, "[b]efore any evidence was discovered in the pat down, Sprinkle pushed the officer away and took flight." *Id.* at 174 (citing *Sprinkle*, 106 F.3d at

616).  In its view, Sprinkle's illegal conduct "broke the causal chain between the unlawful stop and the discovery of the firearm."  *Gaines*, 668 F.3d at 174.  In contrast, said the Court, "the causal chain [in *Gaines*] remains intact."  *Id.*

The Court underscored that Gaines's criminal conduct did not "constitute an intervening event because it took place *after* the discovery of the firearm."  *Gaines*, 668 F.3d at 174 (emphasis in *Gaines*).  Notably, the Court rejected the contention that the *seizure* of the firearm, rather than its *discovery*, "is the critical act for assessing whether an intervening event has taken place."  *Id.* The Court explained "that, for purposes of the attenuation doctrine, the discovery of the evidence is the relevant event."  *Id.*

The Court concluded, *id.* at 175:  "[W]e have little difficulty concluding that where, as here, the discovery of the challenged evidence follows an unlawful search, but precedes an independent criminal act on the part of the defendant, that criminal act is not an intervening event for the purpose of determining whether the 'taint' of the unlawful police action is purged."  Further, the Court said, *id.* at 776:  "Police discovered the firearm on Gaines' person before his commission of another crime . . . [W]e hold that Gaines' act of assault did not purge the taint of the unlawful stop, and the district court properly granted the motion to suppress."

In his dissent, Judge Niemeyer maintained that "[t]he only relevant question is whether knowledge of the existence of the gun gained by its discovery was '*exploited*' to enable the officers to seize the gun after the assault."  *Id.* at 177 (citing *Wong Sun*, 371 U.S. at 487-88 (emphasis in dissent).  He pointed out that the officers did not use the discovery of the gun to arrest Gaines or to seize the weapon.  Rather, the gun fell from the defendant's waistband during the struggle.  *Id.* Because discovery of the gun was not exploited to seize it, Judge Niemeyer regarded the discovery of the gun as "inconsequential" to its seizure.  *Id.*

In my view, this case is governed by *Wong Sun* and *Sprinkle*, not *Gaines*.

To begin, the defense has vigorously challenged the veracity of Detective Stewart, suggesting that he fabricated the claim that he conducted a pat down of the defendant because he saw an L-shaped bulge in the defendant's pants. In this regard, the defendant points to contemporaneous statements of Detective Stewart in which he never mentioned that he saw such a bulge through the defendant's clothes. If the Court were to credit the defense position, then clearly Detective Stewart did not discover the gun before the illegal conduct of the defendant. But, I have credited Detective Stewart's assertion that he conducted the pat down because, among other things, he saw a bulge in defendant's pants that resembled the shape of a gun.

Unlike in *Gaines*, there is no evidence of an actual, confirmed discovery of a weapon before the intervening illegal conduct of the defendant. In *Gaines*, the officer shouted "gun" *before* the defendant assaulted the officer and thus, according to the Court, the existence of the gun was discovered *before* the defendant engaged in further criminal conduct. Here, the officer is heard on the video asking the defendant to identify the object. The certainty that permeated *Gaines* is not present here. To the contrary, the weapon was recovered from the defendant's body, as shown on the body worn video, only after the defendant engaged in a struggle with the officer, then drove off in his car and crashed it two times.

To be sure, Detective Stewart would have discovered the gun if he had been able to complete the pat down. As noted, the officer felt the weapon and believed it was a gun. But, because of the defendant's actions, the pat down was not completed.

In my view, the defendant's conduct during the pat down constituted a distinct and intervening event, sufficiently distinguishable so as to purge any earlier alleged taint. To conclude otherwise would "immunize" the defendant from prosecution for a distinct criminal offense.

### G.  Inevitable Discovery

Detective Stewart testified that, because the defendant did not have a driver's license, he "had no choice" but to have the vehicle towed.  ECF 79 at 43.  And, according to the officer, "department policy" required the vehicle to be towed after the vehicle crashes.  *Id.* at 55.

When a vehicle is towed, BPD Policy 902 (Government's Exhibit 7) provides for "inventory [of] all personal and detachable property of value not removed from the vehicle by the owner or operator."  *Id.* at 6.  However, "[a]n inventory is not conducted for the purpose of searching for contraband, but to secure the contents of the vehicle and to protect the officer against civil liability arising from claims of loss or damage."  *Id.*

As discussed, the exclusionary rule requires the suppression of evidence that is "obtained by way of a Fourth Amendment violation."  *Davis*, 564 U.S. at 232.  Such evidence is regarded as the fruit of unlawful police conduct.  *Wong Sun*, 371 U.S. at 484-85 (concluding that evidence derived in violation of the Fourth Amendment is deemed "fruit of the poisonous tree" and is inadmissible); *see United States v. Kimble,* 855 F.3d 604, 610 (4th Cir. 2017); *Stephens*, 764 F.3d at 335; *Doyle*, 650 F.3d at 466; *see also United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) ("Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations.").  However, the government argues that, even if the pat down of defendant was unreasonable, the inevitable discovery doctrine precludes suppression of the evidence because the firearm would have been discovered during a required inventory search.

The doctrine of inevitable discovery permits the introduction of improperly seized evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information

ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017); *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987).  According to the government, the BPD would have found the weapon and the contraband during a required and lawful inventory search.

"'Lawful means' include searches that fall into an exception to the warrant requirement, 'such as an inventory search[] that would have inevitably uncovered the evidence in question.'" *United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019) (citation omitted) (brackets in *Seay*). Notably, "the premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence.  Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible." *Whitehorn*, 813 F.2d at 650 n.4.  But, mere speculation that evidence could have been discovered is not sufficient.  *United States v. Alston*, 941 F.3d 132, 138-40 (4th Cir. 2019), *cert. denied*, ___ U.S. ___, 140 S. Ct. 1221 (2020).

An inventory search is permitted when it is conducted according to standard procedures "designed to secure the vehicle or its contents." *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017); *see United States v. Brown*, 787 F.2d 929, 931-32 and n.3 (4th Cir. 1986).  "For the inventory exception to apply, the search must have 'be[en] conducted according to standardized criteria,' such as a uniform police department policy, and performed in good faith." *United States v. Matthews*, 591 F.3d 230, 235 (4th Cir. 2009) (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 n. 6, (1987)) (alterations in *Matthews*) (citations omitted); *see United States v. Buster*, 26 F.4th 627, 633-34 (4th Cir. 2022).  The purpose of the inventory search is to secure items in lawful police custody, not to gather incriminating evidence.  *United States v. Treisman*, 71 F.4th 225, 234 (4th Cir. 2023).

In *Seay*, 944 F.3d 220, the Fourth Circuit upheld the warrantless search of a suspect's bag as a lawful inventory search. In that case, officers responded to a hotel to evict a difficult customer, Devin Bracey. *Id*. at 221. After officers knocked on the door, Bracey opened the door and officers informed him and the defendant that they had to leave. *Id*. The defendant and Bracey gathered their belongings and left the room. *Id*. Soon after, officers searched the room and found drug paraphernalia in women's underwear and ammunition in the toilet and ordered the defendant and Bracey back to the room. *Id*. Officers discussed the possibility of arresting the defendant for possession of ammunition as a prohibited person but decided to interview him and Bracey first. *Id*.

After interviewing the couple, officers developed probable cause to arrest Bracey. *Id*. Officers wanted to determine which property was whose before they searched Bracey prior to taking her to the lockup. *Id*. at 222. As officers searched Bracey's belongings, an officer asked her who owned the plastic bag and she responded, "this stuff is our stuff." *Id*. Officers searched the bag and found a silver handgun. *Id*. Thereafter, the defendant was indicted on one count of possession of a firearm as a prohibited person and he moved to suppress the firearm. The district court ruled that the search of the plastic bag was not a lawful search incident to arrest but denied the defendant's motion to suppress, concluding that officers inevitably would have discovered the evidence by lawful means. *Id*.

The Fourth Circuit upheld the lawfulness of the inventory search. *Id*. at 223. The officers testified that it was police department procedure "to inventory an arrestee's belongings before taking her to jail." *Id*. Of relevance here, the Court indicated that the officers' testimony explaining the inventory procedure was sufficient and the government was not required to provide a written inventory policy. *Id*. (citing *Bullette*, 854 F.3d at 266).

Courts have rejected the application of the inevitable discovery doctrine under a variety of circumstances. In *United States v. Jenkins*, 876 F.2d 1085 (2d Cir. 1989), for example, the court explained that "before an inventory search is permissible, the government must have legitimate custody of the property to be inventoried, either as a result of lawful arrest . . . or by some other method." (citing *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983)). Because police in *Jenkins* arrested the defendant for a crime "he had not yet committed," the arrest was illegal and "no valid inventory search could have been based on that arrest." *Jenkins*, 876 F.2d at 1089; *cf. United States v. Infante-Ruiz*, 13 F.3d 498, 503 (1st Cir. 1994) (rejecting the inevitable discovery doctrine where the government could not show "that the officers could have taken 'legitimate custody' of the vehicle but for the discovery of the" contraband).

Furthermore, the inventory exception is not available to police who act "in bad faith or for the sole purpose of investigation." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *see also, e.g.*, *United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007) (explaining that an inventory search is not lawful where "the purpose of the inventory" of property is "to gather incriminating evidence against the owner"). As the Supreme Court has said, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Therefore, the government "may not raise the inventory-search banner in an after-the-fact attempt to justify what was . . . purely and simply a search for incriminating evidence." *United States v. Ball*, 804 F.3d 1238, 1241 (8th Cir. 2015) (citation omitted) (alteration in *Ball*); *see also, e.g.*, *United States v. Monclavo-Cruz*, 662 F.2d 1285, 1289 (9th Cir. 1981) (ruling the search of a purse did not qualify as an inventory search where the officer "clearly had an investigatory purpose"); *United States v. Johnson*, TDC-16-135, 2017 WL 2256599, at *10 (D. Md. May 22, 2017) (concluding that the search of a vehicle was not a valid inventory search because of "indicia

that the search was aimed at gathering evidence," including that the officer searched the car before issuing a citation, began the search without explaining the search was for the "sole purpose" of documenting its contents, was not prepared to document the contents of the vehicle, and only documented the incriminating items found in the car).

I conclude that, under the written BPD towing policy, the contraband in the vehicle inevitably would have been found during the required inventory search.

### H. Search Incident to Arrest and Plain View

In the Acura, after the defendant was subdued, Detective Stewart searched the defendant, without a warrant.  The officer recovered a firearm and ammunition from inside the defendant's pants.  No warrant was required, because the officer's conduct constituted a lawful search incident to arrest.  *See Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam); *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979); *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006).

With regard to the contraband recovered from the vehicle, the government argues, as an alternative to the inevitable discovery doctrine, that the contraband was lawfully seized because it was in plain view.  Indeed, as noted, Detective Stewart testified that, after the crashes, he saw the contraband in the car.

Under the plain view doctrine, the police may seize incriminating evidence, without a warrant, "when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent."  *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997); *see also United States v. Runner*, 43 F.4th 417, 421-23 (4th Cir. 2022), *cert. denied*, ___ U.S. ___, 143 S. Ct. 532 (2022).

66

Here, the requisite criteria are satisfied so as to support a finding of plain view.  Therefore, I conclude that the contraband was lawfully recovered under the plain view doctrine.


### IV.    Conclusion

For the reasons stated above, I shall deny the Motion.  An Order follows.


Date:  October 19, 2023                                   _____/s/_____
                                                          Ellen L. Hollander
                                                          United States District Judge